**Slip Op. 05-153**

UNITED STATES COURT OF INTERNATIONAL TRADE

FORMER EMPLOYEES OF INTERNATIONAL    :
     BUSINESS MACHINES CORPORATION,

                               :

              *Plaintiffs*,

                               :         Court No. 04-00079

             v.

                               :

U.S. SECRETARY OF LABOR,

                               :

             *Defendant.*

[Plaintiffs' motion for judgment on the agency record granted in part, and action remanded to Defendant for further proceedings consistent with opinion.]

Dated: December 2, 2005

     King & Spalding LLP (J. Michael Taylor, Christine E. Savage, Douglas S. Ierley, and Stephen A. Jones), for Plaintiffs.

     Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael D. Panzera); Stephen Jones, Office of the Solicitor, U.S. Department of Labor, Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

     In some cases for as many as 30 or 40 years up to the time of their termination in 2003, Plaintiffs in this action (the "Former Employees") labored in the oil and gas industry, supporting exploration, drilling, and production from the same wells owned by the same oil company, doing the same tasks, day in and day out, seated at the same desks, inside the same facility in Tulsa, Oklahoma.

The Former Employees' initial employer, Amoco Corporation, merged with The British Petroleum Company p.l.c. in 1998, and – as a result – the Former Employees became employees of BP Amoco Group (now known as BP p.l.c., or simply "BP"). The Former Employees survived the layoffs that followed the 1998 merger. Their colleagues who were less fortunate were later certified as eligible to apply for Trade Adjustment Assistance ("TAA") benefits, in 1999.

In 2000, the Former Employees were struck by another wave of corporate restructuring, when BP "outsourced" their unit to Pricewaterhouse Coopers ("PwC"). Two years later, IBM acquired PwC's consulting services business. Thus, the Former Employees were employees of IBM at the time of their termination in late 2003.

According to the Former Employees, although they had been "outsourced" – first to PwC, and then to IBM – nothing ever really changed except the company signing their paychecks. At the time of their termination, they were still sitting at the same desks in the same building doing the same work for the same company in support of the same production facilities as their former colleagues who were laid off in 1998. Just as their colleagues laid off in 1998 had done, the Former Employees here filed a TAA petition. But the Former Employees' petition met a very different fate.[1]

Pending before the Court is Plaintiffs' Motion for Judgment on the Agency Record, challenging the Labor Department's denial of the Former Employees' petition for TAA benefits.

---

[1] *See* Notice of Determinations Regarding Eligibility to Apply for Worker Adjustment Assistance, 69 Fed. Reg. 2,621, 2,622 (Jan. 16, 2004) ("Notice of Initial Denial"); Notice of Negative Determination Regarding Application for Reconsideration, 69 Fed. Reg. 20,644 (April 16, 2004) ("Notice of Denial of Reconsideration"); Notice of Negative Determination on Reconsideration on Remand, 69 Fed. Reg. 48,527 (Aug. 10, 2004) ("Notice of Second Negative Redetermination on Remand").

*See generally* Memorandum in Support of Plaintiff's Motion for Summary Judgment on the Agency

Record ("Pls.' Brief"); Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion

for Judgment on the Agency Record ("Pls.' Reply Brief").  The Government opposes Plaintiffs'

motion, maintaining that the Labor Department's determination is supported by substantial evidence

in the record and otherwise in accordance with law.  *See generally* Defendant's Response in

Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("Def.'s Brief").

Jurisdiction lies under 28 U.S.C. § 1581(d)(1) (2000).[2]  For the reasons set forth below,

Plaintiffs' motion is granted in part, and this action is remanded to Defendant for further proceedings

consistent with this opinion.

## I.  The Relevant Legal Framework

Trade adjustment assistance ("TAA") programs historically have been – and today continue

to be – touted as the *quid pro quo* for U.S. national policies of free trade.  *See generally* Former

Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor, 27 CIT ____, ____, 298 F. Supp. 2d 1338,

1349-50 (2003) ("Chevron III") (summarizing policy underpinnings of trade adjustment assistance

laws).

The trade adjustment assistance laws are generally designed to assist workers who have lost

their jobs as a result of increased import competition from – or shifts in production to – other

countries, by helping those workers "learn the new skills necessary to find productive employment

in a changing American economy."  Former Employees of Chevron Prods. Co. v. U.S. Sec'y of

---

[2]Except as otherwise noted, all statutory citations are to the 2000 edition of the United States
Code.

Labor, 26 CIT 1272, 1273, 245 F. Supp. 2d 1312, 1317 (2002) ("Chevron I") (*quoting* S. Rep. No.

100-71, at 11 (1987)).  Today's TAA program entitles eligible workers to receive benefits which

may include employment services (such as career counseling, resume-writing and interview skills

workshops, and job referral programs), vocational training, job search and relocation allowances,

income support payments, and a Health Insurance Coverage Tax Credit.  *See generally* 19 U.S.C.

§ 2272 *et seq.* (2000 & Supp. II 2002).

The trade adjustment assistance laws are remedial legislation and, as such, are to be

construed broadly to effectuate their intended purpose.  UAW v. Marshall, 584 F.2d 390, 396 (D.C.

Cir. 1978) (recognizing the "general remedial purpose" of TAA statutes, and noting that "remedial

statutes are to be liberally construed").[3]  Moreover, both "because of the *ex parte* nature of the

certification process, and the remedial purpose of [the statutes], the [Labor Department] is obliged

to conduct [its] investigation with the utmost regard for the interests of the petitioning workers."

Stidham v. U.S. Dep't of Labor, 11 CIT 548, 551, 669 F. Supp. 432, 435 (1987) (*citing* Abbott v.

Donovan, 7 CIT 323, 327-28, 588 F. Supp. 1438, 1442 (1984) (quotations omitted)).

Thus, although the Labor Department is vested with considerable discretion in the conduct

of its investigations of trade adjustment assistance claims, "there exists a threshold requirement of

reasonable inquiry."  Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor, 17 CIT

---

[3]*See also* Former Employees of Ameriphone, Inc. v. United States, 27 CIT ____, ____, 288
F. Supp. 2d 1353, 1355 (2003) (citations omitted); Former Employees of Electronic Data Sys. Corp.
v. U.S. Sec'y of Labor, 28 CIT ____, ____, 350 F. Supp. 2d 1282, 1290 (2004); Former Employees
of Champion Aviation Prods. v. Herman, 23 CIT 349, 352 (1999) (citations omitted) (NAFTA-TAA
statute is remedial legislation, to be construed broadly); Chevron I, 26 CIT at 1274, 245 F. Supp. 2d
at 1318 (citations omitted) (same).

126, 130, 814 F. Supp. 1111, 1115 (1993). Courts have not hesitated to set aside agency determinations which are the product of perfunctory investigations.[4]

### A. The "Service Workers" Test

The TAA program was originally established to provide assistance to production workers, as the nation transitioned to a more service-oriented economy. Even today, the language of the TAA statute focuses on workers involved in "production." *See* 19 U.S.C. § 2272(a) (Supp. II 2002).[5]

_____

[4]*See*, *e.g.*, Ameriphone, 27 CIT at _____ n.3, 288 F. Supp. 2d at 1355 n.3 (cataloguing numerous opinions criticizing the Labor Department's handling of TAA cases).

[5]Specifically, the TAA statute provides for the certification of workers where:

(1)  a significant number or proportion of the workers in such workers' firm, or an appropriate subdivision of the firm, have become . . . separated . . . ; and

(2)  (A)  (i)  the sales or production, or both, of such firm or subdivision have decreased absolutely;

          (ii)  imports of articles like or directly competitive with articles produced by such firm or subdivision have increased; and

          (iii)  the increase in imports described in clause (ii) contributed importantly to such workers' separation or threat of separation and to the decline in the sales or production of such firm or subdivision; or

     (B)  (i)  there has been a shift in production by such workers' firm or subdivision to a foreign country of articles like or directly competitive with articles which are produced by such firm or subdivision; and

          (ii)  (I)  the country to which the workers' firm has shifted production of the articles is a party to a free trade agreement with the United States;

               (II)  the country to which the workers' firm has shifted production of the articles is a beneficiary country under the Andean Trade Preference Act . . . , African Growth and Opportunity Act . . . , or the Caribbean Basin Economic Recovery Act . . . ; or

Thus, on its face, the TAA statute does not speak directly to the coverage of "service workers" such as the Former Employees here. However, for nearly 25 years, the Labor Department has interpreted the statute to cover service workers where:

(1) *their separation was caused importantly by a reduced demand for their services from* a parent firm, a firm otherwise related to the subject firm by ownership, or *a firm related by control*;

(2) the reduction in the demand for their services originated at a production facility whose workers independently met the statutory criteria for certification; and

(3) the reduction directly related to the product impacted by imports.

Chevron I, 26 CIT at 1285, 245 F. Supp. 2d at 1328 (emphasis added) (original emphasis omitted) (citations omitted); *see also* Abbott v. Donovan, 6 CIT 92, 100-01, 570 F. Supp. 41, 49 (1983).

Central to the case at bar is the concept of "control," reflected in the first criterion of the service workers test (above). Historically, the Labor Department interpreted "control" to refer to "ownership and corporate voting control." Former Employees of Pittsburgh Logistics Systems, Inc. v. U.S. Sec'y of Labor, 27 CIT ____, ____, 2003 WL 22020510 at * 9 (2003) ("Pittsburgh Logistics II"). However, in Pittsburgh Logistics, the court ruled that the term must be interpreted more expansively, to include not only corporate/legal control, but also operational and

_____

(III)   there has been or is likely to be an increase in imports of articles that are like or directly competitive with articles which are or were produced by such firm or subdivision.

19 U.S.C. § 2272(a) (Supp. II 2002).

management/administrative control as well. *See* <u>Pittsburgh Logistics II</u>, 27 CIT at ____, 2003 WL 22020510 at ** 11-12, 14.

In response to <u>Pittsburgh Logistics</u> and other similar cases, the Labor Department recently revised its policy on certification of so-called "leased" workers (such as the Former Employees here). *See* Labor Department Internal Memo re: New Leased Workers Policy (Jan. 23, 2004) (CSAR 261-62).

### B.  <u>The Labor Department's New Leased Workers Policy</u>

The workers in <u>Pittsburgh Logistics</u> had been terminated from their employment at an LTV Steel Company facility in Independence, Ohio, after LTV ceased production.  The <u>Pittsburgh Logistics</u> ("PLS") workers petitioned for TAA certification, asserting that they were a "PLS subdivision" of LTV consisting of former LTV workers who had been "outsourced" to PLS; "that they were under the *de facto* control of LTV"; and that their duties were essential to the production of steel at LTV facilities.  <u>Former Employees of Pittsburgh Logistics Systems, Inc. v. U.S. Sec'y of Labor</u>, 27 CIT ____, ____, 2003 WL 716272 at * 2 (2003) ("<u>Pittsburgh Logistics I</u>").

Although the Labor Department had certified workers at LTV's Cleveland plant (as well as certain workers at LTV's Independence facility), the agency initially denied the petition of the PLS workers, based in part on its finding that they were service workers and that their employer – PLS – was not related to LTV by ownership or "control." <u>Pittsburgh Logistics I</u>, 27 CIT at ____, 2003 WL 716272 at ** 1-2.[6]  But, based on the court's more expansive interpretation of the term

--------------------------------------

[6]The Labor Department further concluded that – even assuming that the duties of the PLS workers were deemed to have constituted "production" – the workers nevertheless could not be certified as production workers, based on the agency's finding that the workers' employer, PLS, was not "a 'firm' engaged in steel production or an 'appropriate subdivision' of a steel producer."

"control," and its determination that the PLS workers were indeed under the operational control of LTV, the Labor Department was ordered to certify the PLS workers as eligible for TAA benefits. Pittsburgh Logistics II, 27 CIT at ____, 2003 WL 22020510 at ** 14-15.[7]

Wackenhut raised basically the same issues presented in Pittsburgh Logistics. *See* Former Employees of Wackenhut Corp. v. U.S. Sec'y of Labor, Court No. 02-00758. The Wackenhut Corporation had supplied BHP Copper, Inc. with workers who had provided security services at a BHP production facility in Arizona. Following lay-offs due to increased imports of copper cathodes and closure of the facility, the Labor Department certified BHP workers at the facility as eligible for TAA. But the agency twice denied the petition filed by the Wackenhut workers.

Applying the same narrow definition of "control" that it had applied in Pittsburgh Logistics, the Labor Department concluded that the Wackenhut workers could not be certified as service workers because "Wackenhut and BHP are not controlled or substantially beneficially owned by the same persons." The Wackenhut Corporation, San Manuel, AZ: Notice of Negative Determination on Reconsideration on Remand, 68 Fed. Reg. 47,097, 47,098 (Aug. 7, 2003); ("Wackenhut Notice of Denial on Reconsideration") *see also* Notice of Determinations Regarding Eligibility to Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance, 67 Fed. Reg.

---

Pittsburgh Logistics I, 27 CIT ____, ____, 2003 WL 716272 at * 4. Thus, the agency reasoned, the workers' employer "was not 'the' producer of the import-impacted article." *Id*.

[7]Although Pittsburgh Logistics II focused primarily on "control" in the context of a service workers analysis, the court observed that the reasoning of its decision has "important ramifications" for a production workers analysis as well. *See* Pittsburgh Logistics II, 27 CIT at ____, 2003 WL 22020510 at * 14.

67,421 (Nov. 5, 2002).[8]

The issuance of Pittsburgh Logistics II turned the tide for the Wackenhut workers. Based on Pittsburgh Logistics, the Labor Department revised its policy on the treatment of leased workers, resulting in the Wackenhut workers' certification. *See* The Wackenhut Corp., San Manuel, AZ: Notice of Revised Determination, 69 Fed. Reg. 26,623 (May 13, 2004) (referring to "a reinterpretation of the Trade Act term [']workers of a firm[']") ("Wackenhut Notice of Revised Determination").

As the Government explains it, "[i]n response to the Court's decision in Pittsburgh Logistics, [the Labor Department] issued a memorandum that clarified . . . that the agency would no longer categorically deny certification for leased service workers." Def.'s Brief at 35; *see also* Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62).[9] According to that January 2004 memorandum, which specifically references Wackenhut, "the existence of a standard

---

[8]As in Pittsburgh Logistics, the Labor Department further concluded that – without regard to the nature of their duties (*i.e.*, even if their duties were deemed to constitute "production") – the Wackenhut workers could not be certified as production workers, based on the agency's finding that their employer, Wackenhut, "was not a firm that produced an import-impacted article." Wackenhut Notice of Revised Determination, 68 Fed. Reg. at 47,098.

[9]According to the Labor Department memorandum, the agency historically had included leased *production* workers in TAA certifications, but had excluded leased *service* workers. *See* Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62).

Although it has no direct bearing on this case, it is worth noting that the agency's claim that it historically had certified leased production workers appears to conflict with the agency's position in cases such as Pittsburgh Logistics and Wackenhut. In those cases, the Labor Department had argued that – even if the workers' duties were deemed to constitute "production" – the workers nevertheless could not be certified as production workers, because their employers (PLS and Wackenhut, respectively) were not the firms that produced the trade-impacted articles. *See* nn.6 & 8, *supra*.

contract between the contractor firm [*i.e.*, the leased workers' employer] and the subject firm [*i.e.*, the company producing the trade-impacted article] which should be considered sufficient evidence to prove the existence of a joint employer relationship." Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62). The memorandum further specifies that "[w]orkers covered by the contract must perform their duties onsite at the affected location." *Id.*[10]

Other than the statement quoted above, the Labor Department memorandum says little about the concept of a "joint employer" relationship, except to incorporate by reference another memorandum – missing from the record here – which apparently discusses that concept at greater length. *See* Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62) (referring to a "memorandum, dated November 21, 2003, requesting [a] decision on the issue of leased production vs. service workers" that apparently outlines options including a "'joint employer' option (Option 1)," which the new Leased Workers Policy purports to adopt with certain "important differences"). And, as detailed in section IV.C.1 below, the Labor Department memorandum is silent on the agency's rationale for its so-called "location requirement" – *i.e.*, its requirement that

---

[10]Significantly, the Labor Department memorandum does not identify operational (or other) "control" as a requirement for certification of leased workers. *See* Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62).

It is unclear whether – as a matter of practice – the agency has consistently and uniformly required evidence of "control" in cases in which it has applied its new Leased Workers Policy. *Compare* Wackenhut Notice of Revised Determination, 69 Fed. Reg. at 26,623 (finding that Wackenhut workers "remained under the control . . . [of] the firm producing the article (BHP Copper, Inc.)") *with* American Wood Moulding, LLC, El Paso, Texas: Notice of Negative Determination Regarding Application for Reconsideration, 70 Fed. Reg. 45,435, 45,436 (Aug. 5, 2005) (stating that service workers eligible for TAA certification include "leased workers who perform their duties onsite at the TAA certifiable location on [an] established contractual basis") ("American Wood Notice of Denial of Reconsideration").

leased workers must "perform their duties onsite at the affected location" to be eligible for certification. *Id*.

### C. "Certified" vs. "Certifiable"

Another recent change in Labor Department policy concerns the second criterion of the service workers test, outlined in section I. A above. That criterion requires that the reduction in the demand for the services of the displaced workers have originated at a production facility *whose workers independently met the statutory criteria for certification*. In at least some cases in the past, the Labor Department had interpreted the criterion to require that:

> Before service workers [could] be considered eligible for TAA, they [had to] be in direct support of an affiliated facility *currently certified* for TAA or employed on a contractual basis at a location *currently certified* for TAA.

Consent Motion for [Second] Voluntary Remand at 5 (citation omitted).

In response to an inquiry from the Court in this case questioning the Labor Department's interpretation,[11] the Government advised that the agency had reconsidered its position. Under the Labor Department's new policy, as of April 2004:

> Labor will certify petitions from workers who perform services for a firm or an appropriate subdivision of such firm if the work of the petitioning workers is related to the firm's production of a "trade-impacted" article under 19 U.S.C. § 2272 and the workers otherwise satisfy Trade Act eligibility criteria.

---

[11]*See* Letter from Court to Counsel for Defendant (April 23, 2004).

*Id.*[12]  As explained in section IV.D below, however, it is not entirely clear exactly how the new policy set forth above intersects with the Labor Department's new Leased Workers Policy and the classic service workers test.  It is therefore not entirely clear exactly what workers such as the Former Employees here must prove to establish their right to TAA certification.

## II.  Background

The chain of events culminating in this action stretches back more than a decade into the past.  The highlights include a corporate merger, the reduction in the workforce that followed that merger, the "outsourcing" of the Former Employees and their eventual termination, and a series of determinations by the Labor Department denying the Former Employees' petition for TAA benefits.

### A.  The Facts of the Case

Till 1998, the Former Employees were employed by Amoco Corporation, working at an accounting center in Tulsa, Oklahoma ("Accounting Center").  Supplemental Administrative Record

---

[12]The Labor Department's memorandum establishing its new Leased Worker Policy (*see* section I.B, *supra*) states that "leased workers who are working at the same location as workers who have been *previously certified* as eligible for TAA should be certified as well."  Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62) (emphasis added).  However, that memorandum (issued in January 2004) predated the agency's April 2004 change of policy on "certified" *versus* "certifiable."

It appears that the agency now reflects the developments of April 2004 in applying its new Leased Workers Policy, focusing on "certifiable" rather than "certified."  *See, e.g.*, American Wood Notice of Denial of Reconsideration, 70 Fed. Reg. at 45,436 (stating that the service workers eligible for TAA certification include "leased workers who perform their duties onsite at [a] *TAA certifiable location*") (emphasis added).

("SAR") 119.[13]  In December 1998, Amoco merged with The British Petroleum Company p.l.c.  As a result of that merger, the Former Employees became employees of the new combined corporate entity – BP Amoco Group (now known as BP p.l.c., or simply "BP").  Administrative Record ("AR") 43; SAR 119.  Throughout this period, the company continued to be engaged in the exploration, drilling, and production of oil and natural gas in the United States.  SAR 120, 190.

After the 1998 merger, BP reduced its workforce at the Accounting Center.  Although the Former Employees who are plaintiffs here survived that reduction in force, some of their colleagues at the Accounting Center were not so lucky.  However, the Labor Department later determined that the workers laid off from the Accounting Center had been "engaged in activities related to exploration and production of crude oil and natural gas," and were therefore entitled to TAA certification.  That certification, in turn, was amended to reflect new ownership and another name change to BP/AMOCO Production Company, Inc.  *See* AR 43; SAR 125-26; Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,644.  The certification expired two years later, in mid-February 2001.  *Id*.

---

[13]Because this action was remanded to the Labor Department, there are now two separately-paginated administrative records – the initial Administrative Record (which includes the records of both the agency's initial investigation and its first remand investigation), and the Supplemental Administrative Record (which consists of the record of the second remand investigation). Moreover, because confidential information is included in the file, there are two versions of each of those records – public and confidential.

Citations to the public versions of the Administrative Record and the Supplemental Administrative Record are noted as "AR ____" and "SAR ____," respectively.  Citations to the confidential versions are, in turn, noted as "CAR ____" and "CSAR ____."

In the meantime, the Former Employees and others at the Accounting Center who had survived the post-merger reductions in force were swept up in another wave of corporate restructuring. In 2000, BP "outsourced" the Former Employees' unit to Pricewaterhouse Coopers ("PwC"). Then, in October 2002, IBM acquired PwC's consulting services business. As a result, the PwC workers remaining at the Accounting Center – including the Former Employees here – ultimately became employees of IBM. SAR 145-46.

Although the Former Employees had been "outsourced" by BP – first to PwC, and then to IBM – their job descriptions never changed. As two of the Former Employees explained in declarations submitted to the Labor Department, even after their "outsourcing," the workers at the Accounting Center continued to work for BP – "managing oil and gas production and related leases, managing BP's production-related assets and equipment, accounting for various production plants, supporting division order operations, performing procurement functions, and submitting regulatory government reports on North American production." Declaration of Brenda Betts ("Betts Decl.") ¶ 3 (SAR 138); Declaration of Julia Mouser ("Mouser Decl.") ¶ 3 (SAR 144). They even continued to sit at the same desks, and received the same salaries. Betts Decl. ¶¶ 7, 8 (SAR 139-40); Mouser Decl. ¶¶ 7, 8 (SAR 145-46).

The Former Employees thus emphasize that, at the time of their termination in 2003, they were doing the same work for BP as their former colleagues who were laid off following the BP-Amoco merger and who were later certified as eligible for TAA in 1999. Betts Decl. ¶ 6 (SAR 139); Mouser Decl. ¶ 6 (SAR 145). Indeed, the Former Employees attest that, at all times, BP continued to retain control over work done at the Accounting Center, both as a matter of contract and as a

matter of operational reality.  Betts Decl. ¶ 11 (SAR 140); Mouser Decl. ¶ 11 (SAR 146).

The Former Employees point first to the Service Level Agreement ("SLA"), the contract between BP and PwC/IBM, which governed the Former Employees' responsibilities and was referenced in memoranda and handouts specifying their job requirements and goals.  Betts Decl. ¶ 9 (SAR 140); Mouser Decl. ¶ 9 (SAR 146).  As to day-to-day operations, the Former Employees attest that – throughout their tenure at the Accounting Center – they devoted 100% of their time to BP projects; that they received instructions (both directly and  indirectly) from BP managers; that they were required to "code" all their time using a BP tracking system in order to allow BP to track their activities; that – in all external communications – they were required to say or write, "This is [name of Former Employee] from IBM, doing business for BP"; and that all decisions on matters such as incurring costs and undertaking new projects were made by BP management.  Betts Decl. ¶¶ 3,10-11 (SAR 138, 140-41); Mouser Decl. ¶¶ 3, 10-11 (SAR 144, 146-47).

BP also remained a physical presence at the Accounting Center, even after the "outsourcing." The Former Employees continued to work alongside BP personnel, who were permanently assigned to the Accounting Center.  In addition, BP maintained a treasury, the mainframe computer, and other critical infrastructure there.  Betts Decl. ¶ 12 (SAR 141); AR 7; Pls.' Brief at 22-23.

Although the Former Employees had successfully weathered repeated corporate shake-ups in the past, their luck ran out when they were terminated in late 2003 – a development which they trace to surging imports of oil and natural gas, as well as BP's shift from domestic to foreign production.  Betts Decl. ¶ 14 (SAR 141); Mouser Decl. ¶ 14 (147).

B.  The Procedural History of the Case

On November 19, 2003, the Former Employees filed a petition with the Labor Department, seeking TAA certification.  AR 2-12.  Within a week of the initiation of the investigation, their petition was denied.[14]

1.  The First Negative Determination

The Labor Department's first negative determination rested on the agency's conclusion that the Former Employees did not produce an "article" within the meaning of the TAA statute.  Notice of Initial Denial, 69 Fed. Reg. 2,621.

The entirety of the Labor Department's initial investigation was limited to a two-page questionnaire, sent to an IBM official.  *See* CAR 15-16. The agency posed two questions concerning whether IBM produced an article at the Accounting Center.  Nowhere did the agency seek to elicit information concerning the Former Employees' potential eligibility for certification as service workers.  And nowhere did the agency probe IBM's contractual relationship with any other company – even though, on their petition form, the Former Employees listed "IBM/BP Amoco" in the space provided for "Company Name," and explained elsewhere on the form that the "Accounting Center performs accounting services for BPAmerica/BP Amoco Oil."  AR 2.  Based on the scant information before it, the Labor Department sent a letter to the Former Employees, informing them that their TAA petition had been denied.  The letter also outlined the process for requesting reconsideration of the agency's determination.  However, it failed to advise the Former Employees

---

[14]The Labor Department initiated its investigation on November 26, 2003.  By December 2, 2003, it had already made a negative determination.  *See* AR at 23-24, 29; Notice of Investigations Regarding Certifications of Eligibility to Apply for Worker Adjustment Assistance, 68 Fed. Reg. 74,973, 74,975 (Dec. 29, 2003); Notice of Initial Denial, 69 Fed. Reg. 2,621 (Jan. 16, 2004).

of the option of seeking judicial review instead.  *See* AR 25-28.

Out of an abundance of caution, one of the Former Employees filed both a request for reconsideration with the Labor Department *and* a letter with this Court seeking judicial review (later deemed the Complaint).  AR 32; Letter from B. Betts to U.S. Court of International Trade (Feb. 11, 2004).  Confronted with a request for administrative reconsideration and a Summons and Complaint challenging the same TAA determination, the Government requested that the case be remanded to allow the Labor Department to consider the request for reconsideration.  *See* Motion for Voluntary Remand and Relief from Filing the Administrative Record ("Motion for First Voluntary Remand"). The remand was granted less than a week later.

## 2.  The First Voluntary Remand

A mere *one day* after the case was remanded to allow for a more "complete . . . administrative process," the Labor Department issued the results of its investigation on remand, denying the Former Employees' TAA petition once again.  *See* Motion for First Voluntary Remand; Notice of Denial of Reconsideration, 69 Fed. Reg. 20,644.

This time, the Labor Department's negative determination was based primarily on its finding that the Former Employees were "service workers."  According to the agency's criteria then in place, service workers were eligible for TAA certification only if they were either "in direct support of an affiliated facility *currently certified* for TAA or employed on a contractual basis at a location *currently certified* for TAA."  Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,644 (emphasis added).

The Labor Department concluded that the Former Employees did not meet the applicable criteria. *Id.* The agency apparently never considered whether the 1999 certification of the Former Employees' colleagues at the Accounting Center constituted evidence that the Former Employees – as service workers – had provided "direct support" to BP. *Id.* ("The previous certification has no bearing on the determination of eligibility at this time."). Moreover, the agency paid scant attention to the undisputed fact that the Former Employees were paid by BP prior to 1999, and that – notwithstanding their "outsourcing" – they had continued to perform the same work for BP up to the time of their discharge. AR 50; Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,644-45.

The sole evidence to which the Labor Department pointed to support its determination was a statement by an IBM official in Raleigh, North Carolina, who reportedly told the agency that there was no affiliation between the Accounting Center and BP, and that IBM "provide[d] accounting services to [BP] at many locations in the United States and abroad out of [the Accounting Center]." AR 6, 50; Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,644-45. Significantly, that same IBM official later disclaimed "any firsthand knowledge of daily work activities of the Former Employees," and recommended that "someone else at IBM should be contacted for additional information." *See* SAR 123.[15]

---

[15]Although the Labor Department contacted the IBM official on a North Carolina phone exchange (*see* AR 14, 50), the agency repeatedly addressed correspondence to him at the Accounting Center in Tulsa, Oklahoma (*see* AR 28, 60) – apparently oblivious to the fact that he was located in Raleigh, a half-continent away from the Accounting Center. *Cf.* Pittsburgh Logistics I, 27 CIT at ____, 2003 WL 716272 at * 7 (noting that "[t]he Court does not presume that the Employment Development Specialist . . . located in Rochester [New York] who responded to the [agency] investigator's questions about the petitioners was 'in a position to know' the extent of the petitioners' jobs in Independence [Ohio]").

### 3. The Second Voluntary Remand

Less than a month after the results of the initial remand were published, the Government sought a second voluntary remand, prompted by a letter from the Court inquiring about inconsistencies in the Labor Department's articulation of the criteria for TAA certification of service workers. Specifically, the agency was asked to clarify whether the production workers who were supported by the service workers actually had to have been themselves *certified*, or whether it was sufficient that they were *certifiable* (eligible for certification).[16] *See* Consent Motion for [Second] Voluntary Remand.

The Labor Department requested 60 days to complete its second remand investigation. According to the Government, the two-month delay was necessary because the Labor Department's "initial investigation and the inquiries conducted under [the first voluntary remand] were limited to finding out if the service workers in question were performing services for a *currently certified* facility." Consent Motion for [Second] Voluntary Remand at 5-6.

The Government explained that – as discussed in section I.C above – the Labor Department had recently announced a new interpretation of the service workers criteria, which would be applied in the course of the remand. *Id*. The Government further explained that, on remand, the agency

---

[16]The Court's letter observed that the Labor Department's determination denying reconsideration in this action was based in part on the agency's determination that the Former Employees' terminations were not "caused by a reduced demand for their services from a parent or controlling firm or subdivision whose workers produce an article and who are *currently under certification* for TAA." *See* Letter from Court to Counsel for Defendant (April 23, 2004) (*quoting* Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,645) (emphasis added). The Court noted that, in some other TAA cases, the Labor Department had specified the standard as whether the facility at which the workers were employed was "certifiable," rather than whether the facility in fact had been "certified." *Id.*

"intend[ed] to supplement the administrative record with additional evidence regarding the relationship" between the Accounting Center and BP. *Id.*

In the two months that followed, the contract between BP and IBM governing the Accounting Center – the Service Level Agreement, or "SLA" – was one of the most important issues on the table. CSAR 256-58. Indeed, in an e-mail message to an IBM official, one of the Labor Department's investigators stated that evidence of a contractual or operational relationship between BP and the Accounting Center/IBM was "extremely crucial" in determining the Former Employees' eligibility for TAA certification. CSAR 257.

With this new focus to its investigation, the Labor Department verified the existence of the SLA between BP and IBM, under which employees at the Accounting Center continued to provide services to BP even after the "outsourcing" – although the agency failed to obtain a copy of the SLA itself. The agency also learned that, while some IBM employees at the Accounting Center served some other companies, "most" of the work done at that location was for BP. CSAR 256.

A week before the 60-day remand period expired, the Labor Department contacted counsel for the Former Employees to seek their consent to a two-week extension of time for the filing of the remand results, to allow the Labor Department to obtain factual information from BP that was essential to its investigation. Two days later, counsel for the Former Employees was contacted again. This time, the Labor Department sought consent to an extension of *three* weeks. According to the agency investigator who placed the call, the additional time was necessary to "gather and evaluate the information from BP." *See* Pls.' Brief at 13. The Former Employees consented to the

requested extensions. However, the Government never filed a motion with the Court. *See* Pls.'
Brief at 12-13; Def.'s Brief at 26-27.

Instead – mere days after seeking the Former Employees' consent to a three-week extension
of time – the Labor Department filed the results of its second remand investigation, on the 60-day
deadline. The agency denied certification of the Former Employees yet again. Notice of Second
Negative Redetermination on Remand, 69 Fed. Reg. 48,527.

As the Government explains in its brief, the Labor Department cited three grounds for its
determination:

> (1) petitioners were not eligible as production workers because the TAA certification
> for another worker group was immaterial;
>
> (2) the petitioners were not eligible as support service workers because they were not
> under the 'control' of British Petroleum ('BP') during the relevant time period; and
>
> (3) even if BP had 'control' of the petitioners, they would not be eligible for TAA
> benefits because they were not working in a BP production facility or appropriate
> subdivision of such a facility.

Def.'s Brief at 16 (summarizing Notice of Second Negative Redetermination on Remand, 69 Fed.
Reg. 48,527). As discussed in greater detail below, grounds (2) and (3) turn on the interpretation
and application of the Labor Department's new Leased Workers Policy.

### III. Standard of Review

Judicial review of a Labor Department determination denying certification of eligibility for
trade adjustment assistance benefits is confined to the administrative record. *See*, *e.g.*, Former
Employees of Chevron Products Co. v. United States, 27 CIT ____, ____, 279 F. Supp. 2d 1342,
1350 (2003) ("Chevron II") (citations omitted). The agency's determination must be sustained if

it is supported by substantial evidence in the record and is otherwise in accordance with law.  19 U.S.C. § 2395(b); Former Employees of Shaw Pipe, Inc. v. U.S. Sec'y of Labor, 21 CIT 1282, 1284-85, 988 F. Supp. 588, 590 (1997) (citations omitted); Former Employees of Merrow Mach. Co. v. U.S. Sec'y of Labor, 18 CIT 17, 18-19, 843 F. Supp. 1480, 1481 (1994) (citations omitted).

The Labor Department's findings of fact are thus conclusive if they are supported by substantial evidence.  *See* Former Employees of Galey & Lord Indus., Inc. v. Chao, 26 CIT 806, 808-09, 219 F. Supp. 2d 1283, 1285-86 (2002) (citations omitted); Merrow Mach. Co., 18 CIT at 19, 843 F. Supp. at 1481 (*citing* 19 U.S.C. § 2395(b)).  "However, substantial evidence is more than a 'mere scintilla'; it must be enough to reasonably support a conclusion."  Chevron II, 27 CIT at ____, 279 F. Supp. 2d at 1349 (*citing* Galey & Lord Indus., Inc., 26 CIT at 808, 219 F. Supp. 2d at 1286 (citations omitted)).

Moreover, the evidence on which the agency relies does not exist in a vacuum.  Thus, to determine whether substantial evidence exists, the record compiled by the agency must be reviewed "in its entirety, including all evidence that 'fairly detracts from the substantiality of the evidence.'" Consol. Bearings Co. v. United States, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (citations omitted); *see also* Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997) ("[T]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." (citations omitted)); Chevron II, 27 CIT at ____, 279 F. Supp. 2d at 1350 ("[A]n assessment of the substantiality of record evidence must take into account whatever else in the record fairly detracts from its weight." (citations omitted)).

Finally, all rulings based on the agency's findings of fact must be "in accordance with the statute and not . . . arbitrary and capricious"; to that end, "the law requires a showing of reasoned analysis." Former Employees of Gen. Elec. Corp. v. U.S. Dep't of Labor, 14 CIT 608, 611 (1990) (*quoting* UAW v. Marshall, 584 F.2d at 396 n.26).

In short, although it is clear that the scope of judicial review is narrow, and that a court is not free to substitute its judgment for that of the agency, it is equally clear that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Former Employees of Alcatel Telecomms. v. Herman, 24 CIT 655, 658-659, (2000) (*quoting* Motor Vehicle Mfr.'s Assn'n v. State Farm Mut. Auto Ins., 463 U.S. 29, 43 (1983) (citations omitted)).

Where good cause is shown, a case may be remanded to the Labor Department for further investigation and analysis. 19 U.S.C. § 2395(b); *see also* Former Employees of Motorola Ceramic Products v. United States, 336 F.3d 1360, 1362 (Fed. Cir. 2003) (citations omitted). Moreover, the agency is on notice that if its "failure to conduct an adequate investigation . . . [is] taken as indicative that [it] does not care to perform its duties competently . . . the court will not remand . . . ." Former Employees of Barry Callebaut v. Herman, 25 CIT 1226, 1234-35, 177 F. Supp. 2d 1304, 1312-13 (2001). *See also* Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor, 17 CIT 126, 130-31, 814 F. Supp. 1111, 1115-16 (1993) (ordering certification where "another remand . . . would be futile"); *cf.* Former Employees of Pittsburgh Logistics Sys., Inc. v. U.S. Sec'y of Labor, 27 CIT ____, ____, 2003 WL 22020510 at * 7 (2003) (ordering certification where agency "continue[d] to adhere to a discredited position . . . at odds with the developed facts of the record").

*But see* Def.'s Brief at 38-42 (arguing that the Court lacks authority to order certification). To date, the Court of Appeals has side-stepped the issue. *See* Former Employees of Marathon Ashland Pipe Line LLC v. Chao, 370 F.3d 1375, 1386 (Fed. Cir. 2004) (finding, under the circumstances, "no occasion to address the government's argument that the remedy ordered by the [Court of International Trade] was outside [its] authority"); Former Employees of Barry Callebaut v. Chao, 357 F.3d 1377, 1383 (Fed. Cir. 2004) (deeming "moot" "the question of the Court of International Trade's authority to order Labor to certify [workers]" for TAA benefits).

## IV. Analysis

As summarized in section II.B above, the determination here under review is the product of a second voluntary remand. *See* Second Negative Redetermination on Remand, 69 Fed. Reg. 48,527. The Government sought that remand to afford the Labor Department what was the agency's third "bite at the apple," but its first opportunity to review the Former Employees' petition in light of the recent clarification of (or change to) the agency's "service workers" analysis, discussed I.A above. Under that new analysis (effective as of April 2004):

> Labor will certify petitions from workers who perform services for a firm or an appropriate subdivision of such firm [implicating the agency's new Leased Workers Policy] if the work of the petitioning workers is related to the firm's production of a "trade-impacted" article under 19 U.S.C. § 2272 and the workers otherwise satisfy Trade Act eligibility criteria.

Consent Motion for [Second] Voluntary Remand at 5.[17]

---

[17]The second voluntary remand was also the Labor Department's first opportunity to review the Former Employees' petition in light of the agency's new Leased Workers Policy, established in January 2004.

The Government's motion succinctly outlined the scope of the investigation to be conducted

by the Labor Department pursuant to the second voluntary remand:

> The new investigation will focus first upon whether the petitioners are providing support for an IBM facility that produces a trade impacted article. If so, Labor will investigate whether the other applicable criteria for TAA certification have been met. If not, Labor will investigate the relationship between the petitioners and BP/AMOCO [apparently in accordance with the agency's new Leased Workers Policy]. If there is insufficient evidence of a relationship that will support certification, Labor will conclude its investigation and reaffirm the initial denial of benefits. If there is sufficient affiliation [pursuant to the Labor Department's "leased workers policy"], Labor will then investigate BP/AMOCO's operations to determine if the IBM workers are providing support for [BP/AMOCO's] production of a trade-impacted article. If so, Labor will investigate whether the other applicable eligibility criteria for TAA certification have been met. If not, Labor would reaffirm the initial denial of benefits.

Consent Motion for [Second] Voluntary Remand at 6.

As the Government explains in its brief, as a result of the Labor Department's investigation

conducted pursuant to the second voluntary remand, the agency reaffirmed yet again its denial of

the Former Employees' TAA petition, citing three grounds:

> (1) petitioners were not eligible as production workers because the TAA certification for another worker group was immaterial;
>
> (2) the petitioners were not eligible as support service workers because they were not under the 'control' of British Petroleum ('BP') during the relevant time period; and
>
> (3) even if BP had 'control' of the petitioners, they would not be eligible for TAA benefits because they were not working in a BP production facility or appropriate subdivision of such a facility.

Def.'s Brief at 16 (summarizing Notice of Second Negative Redetermination on Remand, 69 Fed.

Reg. 48,527).

As detailed more fully below, the first of the three grounds cited is predicated on a fundamental mischaracterization of the Former Employees' claims. And, as to the other two, the Labor Department's findings and conclusions are either unsupported by substantial evidence or otherwise not in accordance with law, or both.

### A. The Labor Department's Determination As to "Production Workers"

The Labor Department and the Government waste much ink analyzing the Former Employees as "production workers," challenging, *inter alia*, the Former Employees' reliance on the 1999 TAA certification of their former colleagues at the Accounting Center who were laid off following the 1998 merger. *See*, *e.g.*, Notice of Denial of Reconsideration, 69 Fed. Reg. 20,644; Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. 48,527; Def.'s Brief at 29-34.

In fact, it does not appear that the Former Employees here ever even claimed to be production workers. Certainly they do not rely on the 1999 TAA certification to establish that they should be so classified. *See generally* Pls.' Brief at 3, 32-33 (explaining that Labor Department "mischaracterized the [Former Employees'] argument . . . regarding their involvement in the production of crude oil and natural gas" and that "the Former employees relied on the 1999 certification . . . to demonstrate that the jobs performed by the Former Employees, which were the same jobs Labor acknowledged were part of the 1999 certification, were necessary for the production of oil and natural gas.").

More to the point, however, the Labor Department and the Government are much too cavalier in summarily dismissing as "immaterial" the 1999 certification. As discussed more fully in section V.D below, that prior certification bears directly on (and, indeed, may be conclusive as

to) the question of whether, at the time of their discharge, "the [Former Employees were] providing support for [BP's] production of a trade-impacted article." *See* Consent Motion for [Second] Voluntary Remand at 6 (indicating that, if agency's analysis in course of second remand found sufficient "affiliation" between IBM and BP/AMOCO, agency would then "investigate BP/AMOCO's operations to determine if the IBM workers [were] providing support for [BP/AMOCO's] production of a trade-impacted article").

### B. The Labor Department's Determination As to "Service Workers" and "Control"

The Former Employees accuse the Labor Department of focusing solely on the fact that BP lacked corporate ownership of IBM, and – in contravention of Pittsburgh Logistics – ignoring other relevant evidence indicating that BP retained and continued to exercise actual operational control over the Former Employees at the Accounting Center, even after they were "outsourced" by BP. *See* Pls.' Brief at 2-3, 16-22, 30-32; Pls.' Reply Brief at 3, 12. Those accusations are not entirely without foundation. It is, however, also true that – as the Government indignantly observes – the Labor Department is not required to ignore evidence of "legal affiliation" (or lack thereof). *See* Def.'s Brief at 11, 18.[18]

---

[18]As a preliminary matter, it is worth noting that both parties apparently take it for granted that the BP must have had "control" over the Former Employees if they are to be eligible for TAA certification. That assumption would be warranted, based on Pittsburgh Logistics. However, as noted above, the Labor Department's memorandum establishing its new Leased Workers Policy does not identify operational (or other) "control" as a requirement for certification of leased workers. *See* n. 10, *supra* (*citing* Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62)).

It is also unclear whether – as a matter of practice – the Labor Department has consistently and uniformly required evidence of "control" in cases in which it has applied its new Leased

In any event, it is now clear beyond cavil that, in determining "control," the Labor Department cannot confine its analysis solely to legal formalities such as corporate ownership or affiliation. Since at least Pittsburgh Logistics and the development of the Labor Department's new Leased Workers Policy, the agency must define "control" more broadly, to include operational reality – for example, "who 'exercised actual control' over and who 'managed and directed'" the workers in question.[19] *See generally* Pittsburgh Logistics II, 27 CIT at ____, 2003 WL 22020510

---

Workers Policy. *Compare* Wackenhut Notice of Revised Determination, 69 Fed. Reg. at 26,623 (finding that Wackenhut workers "remained under the control . . . [of] the firm producing the article (BHP Copper, Inc.)") *with* American Wood Notice of Denial of Reconsideration, 70 Fed. Reg. at 45,436 (stating that service workers eligible for TAA certification include "leased workers who perform their duties onsite at the TAA certifiable location on [an] established contractual basis"). *See also* UITS Support Center, A Division of NBC Universal, Universal City, CA: Notice of Negative Determination Regarding Application for Reconsideration, 70 Fed. Reg. 46,191, 46,192 (Aug. 9, 2005) (stating that service workers eligible for TAA certification include "leased workers who perform their duties on-site at a facility that meet[s] the eligibility requirements") ("UITS Support Center Notice of Denial of Reconsideration"); ACCPAC International, Inc., Customer Support, Santa Rosa, CA: Notice of Negative Determination on Reconsideration, 70 Fed. Reg. 68,093, 68,094 (Nov. 9, 2005) (same) ("ACCPAC Notice of Negative Determination on Reconsideration").

On remand, the Labor Department shall explain, *inter alia*, both its policy and its practice concerning "control" as a criterion for certification of leased workers. That explanation shall also address the precise meaning and significance of the reference in the new Leased Workers Policy to "the existence of a standard contract between the contractor firm and the subject firm which should be considered sufficient evidence to prove the existence of a joint employer relationship," as well as the statement in various agency determinations (published in the Federal Register) that leased workers are eligible for certification where, *inter alia*, their duties are performed "on an established contractual basis." In addition, consistent with its explanation, the Labor Department shall conduct a "joint employer" analysis of the BP-IBM relationship, and make findings on any relevant criteria for TAA certification.

[19]In its brief, the Government variously restates the test for certification as whether IBM "abdicated" control over the Former Employees or whether "IBM's role was relegated to mere 'nominal staffing.'" *See* Def.'s Brief at 23. But those formulations set the bar much too high for petitioning workers, and misstate the standard even as it has been officially articulated by the agency itself.

at * 9; Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62).

Incredibly, the Government asserts flatly that "there is *no evidence* in the record . . . upon which [the Labor Department] could conclude that BP had 'control' over the [Former Employees]." *See* Def.'s Brief at 20 (emphasis added). To the contrary, as it currently stands, the Administrative Record is replete with essentially uncontradicted evidence which tends to prove that, at all relevant times, BP exercised management and operational control over the Former Employees – that, as the Former Employees put it, virtually nothing about their jobs changed after the outsourcing, except the name of the company signing their paychecks.[20]

---

The Labor Department's internal memorandum establishing its new Leased Workers Policy expressly endorses certification of leased workers where there is a "joint employer" relationship – which is plainly a far cry from limiting certification to cases where the workers' direct employer has "abdicated" all control over them and has been "relegated to mere 'nominal staffing.'" *See* Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62); Pls.' Reply Brief at 4.

Indeed, the Labor Department's new Leased Workers Policy states flatly that "the existence of a standard contract between the contractor firm and the subject firm . . . should be considered sufficient evidence to prove the existence of a joint employer relationship." *See* Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62); *see also* American Wood Notice of Denial of Reconsideration, 70 Fed. Reg. at 45,436 (stating that service workers eligible for TAA certification include "leased workers who perform their duties . . . on [an] established contractual basis"). That would appear to set the bar *very* low. It would seem that all "leased" workers must, by definition, be the subject of "a standard contract between the contractor firm and the subject firm." Certainly that was the case with the Former Employees here.

[20]The facts of this case are particularly compelling, because – much like Pittsburgh Logistics, and in contrast to the more typical "leased workers" case like Wackenhut (where the workers had no pre-existing relationship with the company producing the trade-impacted article) – the Former Employees in this case were employed directly by BP until they (and their work) were "outsourced." Thus – like the PLS workers in Pittsburgh Logistics – the Former Employees here were continuously employed, doing the same work, for the benefit of the same company, at all relevant times. *See generally* Pittsburgh Logistics I, 27 CIT at ____, ____, 2003 WL 716272 at ** 10 (summarizing facts surrounding "outsourcing" of PLS workers), 12 (observing that the fact that a group of leased

Specifically, the Former Employees attest that, after BP outsourced part of its workforce to PwC, "[a]lthough the name on [their] paycheck[s] changed, [they] continued to perform the same work for the benefit of BP that [they had] performed while being paid directly by BP," and that – even after their PwC unit was acquired by IBM – they "continued to perform the same job functions and sit at the same desk[s] that they did when [they were] . . . employee[s] of BP." The Former Employees further attest that, at all times throughout their tenure at the Accounting Center, "BP was contractually and operationally in control of the work performed [there]. . . . BP maintained the power to manage and direct [their] daily activities." Indeed, even after the "outsourcing," in all external communications, the Former Employees were required to identify themselves as "doing business for BP." *See* Betts Decl. ¶¶ 7, 8, 10, 11 (SAR 138-41); Mouser Decl. ¶¶ 7, 8, 10, 11 (SAR 144-47).

Moreover, it appears from the record that the Accounting Center was a "shared" facility, with BP maintaining a physical presence there even after the "outsourcing." According to the Former Employees, they worked alongside BP personnel who were permanently assigned to the Accounting Center. The uncontroverted evidence further establishes that BP maintained infrastructure – including, *inter alia*, a treasury and the mainframe computer – at that location. The facility itself was even sometimes referred to as "the *BP* [or '*British Petroleum*'] *Accounting Center* operated by IBM." *See* CSAR 256; Betts Decl. ¶ 10 (SAR 140); AR 32; Pls.' Brief at 9, 22-24 & n.9; Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,644 (referring to "the British Petroleum Accounting Center operated by IBM").

---

workers had been "outsourced" "would strengthen the[ir] argument for eligibility" for TAA benefits).

In sum, the existing Administrative Record includes relatively ample evidence supporting the Former Employees' claims that – as a practical matter – BP continued to exercise management and operational control over their work up to the time of their termination. In contrast, there is only minimal evidence to support the Labor Department's determination that, at the time of their termination, the Former Employees were under the operational control of IBM. Moreover, the relatively little evidence that supports the agency's position consists of mere conclusory assertions (generally by IBM officials) and/or statements that are contradicted by other record evidence that the Labor Department has failed to address.[21]

_____

[21]The Government boldly claims that the Former Employees do not dispute that they were "subject to IBM's terms and conditions of employment," and that there is no evidence to undermine the Labor Department's finding that the Former Employees "reported directly to IBM managers." *See* Def.'s Brief at 11-12, 19, 22; *see also* Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,527 (agency finding that Former Employees "were subject to IBM's terms and conditions of employment, [and] reported to IBM managers").

To the contrary, the Former Employees vigorously dispute those assertions, and buttress their position with concrete evidence that "bear[s] directly on the issue of BP's control over the Former Employees and directly oppose[s] [the Labor Department's] conclusions." *See* Pls.' Reply Brief at 7; *see also* Pls.' Brief at 20; Betts Decl. ¶¶ 10-11 (SAR 140) (attesting, *inter alia*, that she "received instructions from BP managers – both *directly* and through IBM managers," that BP "was contractually and operationally in control of the work performed" at the Accounting Center, and that "BP maintained the power to manage and direct the daily activities of the Former Employees") (emphasis added); Mouser Decl. ¶¶ 10-11 (SAR 146) (same); SAR 121 (asserting that "the Former Employees received instructions from BP management on a daily basis").

Further, as discussed below, the Labor Department based its determination that the Former Employees here were "subject to IBM's terms and conditions of employment" and "reported directly to IBM managers" on a single conclusory assertion by an IBM official. *See* CSAR 256 (IBM e-mail to Labor Department); Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,527 (agency finding that Former Employees "were subject to IBM's terms and conditions of employment, [and] reported to IBM managers"). But, significantly, in Pittsburgh Logistics, the PLS workers were certified notwithstanding a provision in the contract between PLS and LTV specifying that "PLS [was] supplying its own employees, which [it] controls and directs for employment purposes." Pittsburgh Logistics II, 27 CIT at ____, 2003 WL 22020510 at * 2.

The Labor Department's finding that "the IBM contract with BP does not subject the [Former Employees] to the kind of control by BP" that would make them eligible for TAA certification as leased workers is particularly baffling, for two reasons. *See* Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,528.

First, the Labor Department has never even seen a copy of the BP-IBM contract (known within the two companies as the "Service Level Agreement," or "SLA").[22] The agency's findings as to the content of that contract thus are based solely on the conclusory statements of an IBM official, which are – in turn – substantially controverted by the Former Employees.[23] And, as discussed below, the Labor Department may not rely on the legal conclusions of others as a substitute for its own analysis of the relevant facts. Nor is it permitted to rely on evidence which is fundamentally at odds with other record evidence (at least not without reconciling discrepancies).

A second concern – equally, if not more, troubling – is the implication that the Labor Department need not look beyond the four corners of the relevant contract to determine whether a

---

[22]*See* Pls.' Brief at 19-21; Pls.' Reply Brief at 7-8, 13 n.4; CSAR 200 (IBM e-mail to Labor Department refusing to provide copy of BP-IBM contract because it includes "confidential and proprietary business information").

[23]*Compare* CSAR 199-200 (IBM e-mail to Labor Department characterizing, in summary fashion, the BP-IBM contract and the relationship between the two companies) *with* Betts Decl. ¶ 11 ("As a result of the SLA and the day-to-day direction that employees of the Tulsa facility received from BP managers, . . . BP was contractually and operationally in control of the work performed at the Tulsa facility.") (SAR 140); Mouser Decl. ¶ 11 (SAR 146) (same); SAR 124-25 (asserting that the SLA dictated the scope of the work that the Former Employees performed); Pls.' Brief at 5-7 (stating, *inter alia*, that the "SLA . . . established the performance standards against which the Former Employees' job performance were assessed"), 18-22 (summarizing the sworn declarations submitted by the Former Employees, and arguing that the "only record evidence about the SLA demonstrates that its terms accorded BP control over the Former Employees"); Pls.' Reply Brief at 6-8 (noting that "the daily activities of the Former Employees were directed by BP managers . . . [and] BP defined the scope of the Former Employees' work through [the SLA]").

company producing a trade-impacted article exercised operational "control" over a particular group of leased workers. *See* Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,528 (agency finding that "*the . . . contract . . . does not subject the . . . workers to the kind of control*" that would render the workers eligible for TAA certification). As Pittsburgh Logistics held – and as the Labor Department's new Leased Workers Policy reflects – legal formalities (such as contractual provisions) are not conclusive on the issue of "control." The agency must look beyond such matters, and consider actual operational control as well.

The Government insists that the Labor Department did, in fact, evaluate operational control. *See* Def.'s Brief at 18-19. However, the determination issued by the agency itself reflects virtually no analysis beyond corporate ownership and legal control, with the exception of its findings that the Former Employees were "subject to IBM's terms and conditions of employment, [and] reported to IBM managers" and that they were "located at an IBM facility." *See* Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,527. As note 21 above explains, the first quoted finding has no solid foundation in the existing evidentiary record. And the second quoted finding – that the Former Employees were "located at an IBM facility" (and "were not employed at any BP facility during the relevant time period") – is equally infirm, as discussed in detail in section IV.C, below.[24]

---

[24]To the extent that the Government seeks to use its brief to supplement the bases that the Labor Department itself provided for its determination, those arguments constitute impermissible *post hoc* rationale. *See, e.g.,* SKF USA Inc. v. United States, 254 F.3d 1022, 1028 (Fed. Cir. 2001) ("[C]ourts may not accept . . . counsel's *post hoc* rationalization for agency action.").

In any event, contrary to the Government's claims, the nature of the services rendered to BP by the Former Employees logically has no bearing on the issue of operational control. *See* Def.'s Brief at 18 (asserting that Labor Department relied on the "description of the services petitioners

To be sure, it is not the role of the Court in reviewing the Labor Department's determinations to re-weigh the evidence and substitute its judgment for that of the agency. But the Court is charged with determining whether or not the agency's determination is supported by "substantial evidence" in the record. *See* 19 U.S.C. § 2395. That analysis necessarily requires a review of the evidence on which the agency relies *in the context of the entirety of the administrative record as a whole* (including "whatever in the record fairly detracts from" that evidence). *See*, *e.g.*, Gerald Metals, 132 F.3d at 720; Consol. Bearings Co., 412 F.3d at 1269. Thus, evidence that – standing alone – might otherwise constitute "substantial evidence" may not measure up where, for example, the agency has taken the evidence out of context, or where (as here) there is substantial contradictory evidence in the record that the agency has failed to address.

In the instant case, for example, the Labor Department accorded great weight to an IBM official's representation that the Former Employees "were subject to IBM's terms and conditions of employment, [and] reported to IBM managers." *Compare* CSAR 256 (IBM e-mail to Labor Department) *with* Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,527 (agency finding that Former Employees "were subject to IBM's terms and conditions of employment, [and] reported to IBM managers"). In effect, the agency delegated to an IBM official the power to decide a key aspect of the Former Employees' TAA petition. But, "it is Labor's responsibility, not the responsibility of [a] company official, to determine whether a former employee is eligible for benefits." Former Employees of Federated Merch. Group v. United States,

---

provided to BP"). Similarly, contrary to the Government's implications, there is no significance to IBM's characterization of BP as "an IBM client." *Compare* Def.'s Brief at 18 *with* n. 33, *infra* (discussing irrelevance of such labels).

29 CIT ____, ____, 2005 WL 290015 at * 6 (2005) (citation omitted).

In short, the Labor Department cannot simply adopt as its own the legal conclusions of employers on the issue of "control." Rather, the agency must reach its own conclusions, based on its own thoughtful, thorough, independent analysis of all relevant record facts. *See generally* Former Employees of Electronic Data Sys. Corp. v. U.S. Sec'y of Labor, 28 CIT ____, ____, 350 F. Supp. 2d 1282, 1292-93 (2004) (in relying on company official's statement that company "did not produce articles, but provided computer related services," Labor Department improperly "substituted one . . . [company official's] opinion that the company did not produce 'articles' for [the agency's] own legal inquiry").[25]

Nor is the Labor Department permitted to accept at face value information provided by a source where either (a) that information is contradicted by other evidence on the record, or (b) there is some other reason to question the veracity of the information or the credibility of the source. Here, most of the information on which the agency relied was contradicted by other record evidence;

---

[25]*See also* Former Employees of Ericsson, Inc. v. U.S. Sec'y of Labor, 28 CIT ____, ____, 2004 WL 2491651 at * 7 (2004) (agency erred in relying on company official's "essentially legal conclusion" that workers "[*did*] *not produce a product*!"); Former Employees of IBM Corp., Global Services Division v. U.S. Sec'y of Labor, 29 CIT ____, ____, 387 F. Supp. 2d 1346, 1351-52 (2005) (Labor Department erred in "effectively substitut[ing] the [company official's] opinion for its own inquiry into whether the products produced . . . constituted 'articles' for the purpose of [the] TAA statute"); Former Employees of Ameriphone, Inc., 27 CIT ____, ____, 288 F. Supp. 2d 1353, 1359 (2003) (*citing* Former Employees of Marathon Ashland Pipeline, LLC v. Chao, 26 CIT 739, 744-45, 215 F. Supp. 2d 1345, 1352-53 (2002) (Labor Department's reliance on employer's conclusory assertions concerning "production" constituted impermissible abdication of agency's responsibility to interpret TAA statute and to define terms used in it), *rev'd on other grounds*, 370 F.3d 1375 (Fed. Cir. 2004)).

and the source of much of that information was at least arguably suspect.[26] Under the circumstances,

the Labor Department was obligated to corroborate that information. Inexplicably, the agency failed

to do so. *See generally* Former Employees of Marathon Ashland Pipe Line, LLC v. Chao, 370 F.3d

1375, 1385 (Fed. Cir. 2004) (ruling that the Labor Department is entitled to base TAA

determinations on statements of company officials "if the Secretary *reasonably* concludes that those

statements are creditworthy" and if the statements "are not contradicted by other evidence"; but –

where a conflict in the evidence exists – the Labor Department is "precluded . . . from relying on the

representations by the employer" and is required to take further investigative steps before making

[its] certification decision") (emphasis added).[27]

---

[26] Evidence in the record casts some doubt on IBM's motivation. *See* AR 32 (one of the representative Former Employees observes that "IBM is avoiding publicity as this type of situation (moving US jobs overseas) has become a serious political issue in this election year [*i.e.*, 2004]"). *See also* "I.B.M. Explores Shift of White-Collar Jobs Overseas," The New York Times at C1 (July 22, 2003) (AR 8-11) (reporting on March 2003 conference call in which "two senior I.B.M. officials told their corporate colleagues around the world . . . that I.B.M. needed to accelerate its efforts to move white-collar . . . jobs overseas *even though that might create a backlash among politicians and its own employees*") (emphasis added).

[27] Thus, statements "that are inconsistent, uncorroborated, not entirely based on personal knowledge, and possibly biased do not constitute substantial evidence." Former Employees of Tyco Toys, Inc. v. Brock, 12 CIT 781, 782-83 (1988). *See also* Ameriphone, 27 CIT at _____ n.8, 288 F. Supp. 2d at 1359 n.8; Chevron I, 26 CIT at 1283 n.9, 245 F. Supp. 2d at 1326 n.9 (and cases cited there); Former Employees of Pittsburgh Logistics Sys., Inc. v. U.S. Sec'y of Labor, 27 CIT _____, _____, 2003 WL 716272 at * 6 (2003) (*citing* Former Employees of Shaw Pipe v. U.S. Sec'y of Labor, 21 CIT 1282, 1289, 988 F. Supp. 588, 592 (1997)); Former Employees of Oxford Auto. U.A.W. Local 2088 v. U.S. Dep't of Labor, 27 CIT _____, _____ & n.14, 2003 WL 22282370 at * 5 & n.14 (2003) (and cases cited there); Former Employees of Sun Apparel of Texas v. U.S. Sec'y of Labor, 28 CIT _____, _____, 2004 WL 1875062 at * 8 (2004).

The Labor Department has particular reason to probe the veracity of information where the credibility of the source may be in doubt. *See*, *e.g.*, Chevron I, 26 CIT at 1282 n.8, 245 F. Supp. 2d at 1325 n.8 (noting, then rejecting, Government's claim that there was "no evidence that [company] officials were uncooperative or less than forthright during Labor's investigation"). It is telling that,

The Government attempts to summarize the facts of <u>Pittsburgh Logistics</u> and to cast them

so as to distinguish that case from this one. *See* Def.'s Brief at 21-23. But the specific facts of

<u>Pittsburgh Logistics</u> are not the "acid test" for operational control, *i.e.*, the standard against which

all such cases are to be judged.[28] By definition, such an inquiry is fact-intensive, and cannot be

_____

in <u>Chevron</u>, one current company official feared retaliation by his employer for the assistance he rendered to the petitioning workers. *Id.*, 26 CIT at 1276, 245 F. Supp. 2d at 1320.

Similarly, in <u>Bell Helicopter</u>, the court criticized the Labor Department's reliance on information provided by company officials, emphasizing that:

> [Both company officials] had serious adverse interests to acknowledging or confirming that the job losses were due to the fact that [the firm] could pay Canadians less than Americans . . . [and] . . . intended to do just that. *The public relations implications alone were enough to cast a cloak of suspicion over* [*the firm's*] *responses, both in terms of veracity and completeness.*

<u>Former Employees of Bell Helicopter Textron v. United States</u>, 18 CIT 323, 326 (1994) (emphasis added). Obviously, no employer relishes headlines like "Shipped Out – The Story of How AT&T Moved 3,500 Workers to a New 'Career' at IBM – Knowing It Wouldn't Last." *See* <u>Former Employees of IBM Corp., Global Services Division v. U.S. Sec'y of Labor</u>, 29 CIT at ____, 387 F. Supp. 2d at 1347 (*quoting* headline on news article in <u>The Star Ledger</u>, August 25, 2002).

*See also* Brad Brooks-Rubin, "The Certification Process for Trade Adjustment Assistance: Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. 797, 821-22 n.110 (2005) (*citing* another "example of the bad public relations associated with outsourcing on a local level"); *id.* at 821-22 (emphasizing need for Labor Department to take measures to ensure "that [a former employer's] answers [to agency requests for information] are not tinged with concern for the company's public image," particularly since "some companies have been wary to be seen as contributing to the 'outsourcing' trend").

[28]Here, the Labor Department hasn't even sought to elicit from the Former Employees, IBM, or BP all the information necessary to properly compare this case to <u>Pittsburgh Logistics</u> (or, for that matter, <u>Wackenhut</u> and other similar cases). The agency's claim that the two cases are readily distinguishable thus has a hollow ring.

For their part, the Former Employees contend that the facts of this case closely parallel those of <u>Pittsburgh Logistics</u>. As the Former Employees put it, that case – like this one – involved outsourced workers who continued to perform their same jobs under the operational control of their

reduced to any definitive, neat and tidy checklist or formula. To reach a determination on "control," the Labor Department is necessarily required to engage in a case-by-case analysis of all relevant facts. The bottom line here is that – with the possible exception of the workers' locations (discussed in detail in section IV.C below) – the Labor Department can point to little or no concrete evidence in the existing Administrative Record to distinguish this case in any meaningful fashion from other similar cases (such as Pittsburgh Logistics and Wackenhut) where leased workers have been certified for TAA.[29]

The Government's attempts to invoke principles of agency law are similarly unavailing. *See*, *e.g.*, Def.'s Brief at 11 (alleging that BP-IBM "relationship . . . did not rise to the level of *agency control*") (emphasis added), 20 (arguing that Former Employees have not identified "any aspect of the [BP-IBM] relationship that rendered the petitioners *agents* of BP, rather than IBM" and that "there is no evidence . . . of an *agency relationship*") (emphases added), 29 (asserting that criteria used in performance reviews of Former Employees do not "necessarily . . . constitute evidence of BP's 'control' over those workers to form a *principal-agent relationship*") (emphasis added).[30]

_____

initial employer until they were terminated. *See* Pls.' Reply Brief at 6.

In any event, as explained above, even if the Former Employees' situation does not precisely mirror the facts of Pittsburgh Logistics, it would not necessarily follow that the Former Employees were not under the day-to-day operational control of BP.

[29]The Administrative Record is not only short on facts to support the Labor Department's determination as to "control," it is also essentially devoid of any real agency *analysis* of the record evidence on point. On remand, the agency shall remedy that deficiency.

[30]The Labor Department itself did not invoke agency law, either in its new Leased Workers Policy or in its Second Negative Redetermination on Remand. *See* Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62); Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. 48,527. The Government's invocation of the law of agency is thus

Putting aside for the moment reservations concerning the wisdom of blindly incorporating wholesale into TAA law the entirety of agency law, it is enough to note that the Government's application of that law to the facts of this case is – at a bare minimum – overly-simplistic and incomplete. For example, under basic principles of agency law, "holding out" is a central concept in establishing the existence of an agency relationship. In the instant case, the undisputed evidence of record establishes that – in all their communications, whether by e-mail, fax or phone – the Former Employees were not merely *authorized* but expressly *required* by BP to affirmatively hold themselves out as "doing business for BP." *See* Betts Decl. ¶ 10 (SAR 140); Mouser Decl. ¶ 10 (SAR 146).[31]

That same record evidence also refutes the repeated efforts of the Government and the Labor Department to dismiss the relationship between BP and the former employees it outsourced to PwC/IBM as nothing more than a standard, routine "service provider-client" relationship. *See* Def.'s Brief at 11, 18-20; Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,644 (referring to BP as a "customer[] or client[]" of IBM); Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,527 (finding that IBM employees at Accounting Center provide services to "multiple clients, including BP").[32] In contrast to this case, in the typical "service provider-client"

---

arguably impermissible *post hoc* rationale. *See* n. 24, *supra*. Agency law is, however, the linchpin of Pittsburgh Logistics.

[31]*See*, *e.g.*, Kansallis Finance Ltd. v. Fern, 40 F.3d 476, 480 (1st Cir. 1994) (applying principles of agency law, trial court properly concluded – based on, *inter alia*, manner in which phone calls to law office were answered – that lawyers had clothed purported partner with authority to issue opinion letter binding on them).

[32]The Government seems to suggest that a "service provider-client" relationship is somehow inherently incompatible with an "agency" relationship, and seeks to contrast the two. *See*, *e.g.*,

relationship, the "client" does not even *authorize* – much less *require* – that the "service provider" expressly hold itself out as acting on behalf of the "client."[33]

Finally, as the Labor Department notes in its Second Negative Redetermination on Remand, there is some record evidence to indicate that some of the IBM workers at the Accounting Center have done some work for companies in addition to BP. But the Labor Department "spins" that information by referring broadly to the Accounting Center's work for "multiple clients, including BP." The effect is to obscure the fact that even the IBM official on whom the agency relied confirmed that "most" of the work at the Accounting Center was done for BP.[34]

---

Def.'s Brief at 21-22 (asserting that "[n]othing in Pittsburgh Logistics would serve as a basis for concluding that a mere client relationship is sufficient to establish 'control' for the purpose of eligibility for TAA certification"), 23 (arguing that the Former Employees "have not asserted that the performance requirements pursuant to the SLA are necessarily inconsistent with Labor's finding of a client-service provider relationship between the two companies"), 24 (contending that BP-IBM relationship is "more properly characterized as a client-service provider relationship"). However, there is no basis in the law for the Government's position. *See generally* Pls.' Reply Brief at 3-4. *Cf.* Lincoln Benefit Life Co. v. Edwards, 148 F.3d 999, 1003 (8th Cir. 1998) (concurring opinion) (noting tendency to confuse "agent," "independent contractor," and "employee," and explaining that "[a]n agent can be either an independent contractor or an employee"), *vacated on reh'g for lack of jurisdiction*, 160 F.3d 415 (8th Cir. 1998).

[33]The fact that various internal IBM documents in the Administrative Record refer to BP as a "client" is of no moment. Such labels are meaningless here. For purposes of the analysis at hand, what matters is not the *words* that IBM and BP may have used to describe their relationship, but – rather – the actual *facts* as to the practical realities of the exercise of day-to-day management and operational control over the Former Employees. *See, e.g.*, Shen v. Leo A. Daly Co., 222 F.3d 472, 477 (8th Cir. 2000) ("The existence of an agency relationship does not depend on the terminology the parties use to characterize their relationship, but depends on the facts underlying the relationship.") (citations omitted); Lincoln Benefit Life Co., 148 F.3d at 1002. ("Whether an agency exists depends on the facts underlying the relationship of the parties, irrespective of the words or terminology used by the parties to characterize their relationship.") (citations omitted).

[34]*Compare* Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,527 *with* CSAR 256.

Historically, service workers have been eligible for certification if at least 25% of their work

is in support of a "trade-impacted" article. *See*, *e.g.*, <u>Abbott v. Donovan</u>, 8 CIT 237, 241, 596 F.

Supp. 472, 475-76 (1984). In the instant case, the Labor Department failed to elicit evidence to

quantify precisely the extent of any work done for companies other than BP. But there can be no

doubt that "most" is more than 25%.[35]

---

Regrettably, it appears that this is no isolated incident. The Labor Department has been criticized for distorting and misrepresenting evidence in other cases as well. *See*, *e.g.*, <u>Pittsburgh Logistics</u>, 27 CIT at ____, ____ n.9, 2003 WL 22020510 at * 9, * 13 n.9 (in one instance, Labor Department "egregiously" quoted a contract provision "out of context"; more generally, court took agency to task for repeated use of "out-of-context quotations"); <u>Former Employees of Sun Apparel of Texas v. U.S. Sec'y of Labor</u>, 28 CIT ____, ____, 2004 WL 1875062 at * 4, * 8 (2004) (where employer stated only that patterns and markers were "shipped primarily" by electronic means, Labor Department ignored employer's limiting use of "primarily" and instead drew "the much broader conclusion that [*all*] the patterns and markers were generated and shipped electronically" and, on that basis, concluded that no "production" occurred); <u>Former Employees of Federated Merch. Group v. United States</u>, 29 CIT ____, ____, 2005 WL 290015 at * 5 (2005) (Labor Department "mischaracteriz[ed]" e-mail exchange in which company official explained reason for workers' separation, resulting in improperly "truncated" investigation).

[35]The undisputed evidence further establishes that at least two of the three individual petitioners worked *only* for BP. *See* Betts Decl. ¶¶ 1, 3 (SAR 138) (attesting that she devoted "[o]ne hundred percent of [her] time to work for BP," and that she "performed work for no company other than BP during [her] tenure with IBM"); Mouser Decl. ¶¶ 1, 3 (SAR 144) (same). There is no evidence as to the third. Indeed, there is no evidence in the record to suggest that *any* of the *displaced* IBM workers were among those who did work for companies in addition to BP. (Nor, for that matter, does the record disclose whether any of the Accounting Center workers who were certified in 1999 did work for companies other than BP – although it seems rather unlikely, since they were employed directly by BP at that time.) *See also* AR 32 (one of the three individual petitioners reminds the Labor Department that "[t]his TAA application is for only jobs performing work for British Petroleum"); Pls.' Brief at 21-22.

In any event, as discussed above, it is uncontroverted that well over 25% of the Former Employees' work was in support of BP.

If, on remand, the Labor Department concludes that work performed for companies other than BP precludes certification in this case, the agency shall set forth in detail the legal bases for that conclusion and shall ensure that it is supported by substantial evidence in the record.

On remand, the Labor Department shall reevaluate the existing record evidence on the issue

of "control" (focusing – *inter alia* – on the Former Employees' specific representations and sworn

statements of fact on the matter), and shall conduct such further investigation of the relevant facts

as is necessary to fully develop the evidentiary record[36] (including solicitation of additional

information from the Former Employees, among other sources).[37]  As discussed above, the agency

may not rely on conclusory assertions by company officials – particularly not as to "ultimate facts"

and legal determinations entrusted to the agency, and particularly not where those conclusory

---

[36]It is exceedingly difficult to understand how the Labor Department can reach a determination on "control" without even reviewing the actual contract at issue.  *Cf*. Pittsburgh Logistics II, 27 CIT at ____, 2003 WL 22020510 at * 9 (discussing copy of "service agreement between PLS and LTV that Labor obtained from PLS on remand"); Wackenhut Notice of Denial of Reconsideration, 68 Fed. Reg. at 47,097 (noting that BHP executive provided agency with "a copy of the contract between BHP and Wackenhut").

The Labor Department would be wise to obtain a copy of the Service Level Agreement(s) between BP and PwC/IBM on remand here.  If it fails to do so and nevertheless reaches a determination on "control" that is adverse to the Former Employees, it must explain why it failed to obtain the document(s) in question, why other evidence in the record is an adequate substitute, and why the absence of the document(s) from the Administrative Record should not give rise to an "adverse inference," as the Former Employees urge.  *See* Pls.' Brief at 21 ("If Labor determines it unnecessary to require that a clearly pertinent piece of evidence be placed on the record, then in light of its obligation to 'conduct [its] investigation with the utmost regard for the interests of the petitioning workers,' . . . any uncertainty about that evidence should be resolved in favor of the Former Employees") (citation omitted).

[37]To help ensure the completeness and accuracy of information obtained on remand, the Labor Department shall expressly advise and assure all its contacts at IBM and BP that – unlike regular unemployment compensation, for example – the TAA certification of the Former Employees would involve no expense whatsoever on the part of the companies.

To the same end, the Labor Department shall caution all contacts that they will be held personally accountable by the Court for all information that they provide in the course of the agency's investigation, whether their statements are oral or in writing, and even if they are not made under oath.  *See*, *e.g.*, 18 U.S.C. § 1001 (federal material false statements statute).

assertions are contradicted by detailed, specific factual statements made by the Former Employees

under penalty of perjury.

On remand, the Labor Department shall clearly articulate and apply a standard for "control"

that is consistent with this opinion (clarifying and updating that set forth in its new Leased Workers

Policy).[38]  The agency shall detail the rationale for the standard that it articulates, and – in applying

---

[38]As detailed further below, the Labor Department shall include in the record on remand a complete, self-contained statement articulating all agency criteria for TAA certification of leased workers – in other words, a new, revised, up-to-date Leased Workers Policy.  The agency shall clarify not only its position on "control," but also on "joint employer" relationships, the significance of the existence of a "standard contract between the contractor firm and the subject firm," and any other relevant concepts reflected in the agency's standards.  The new, revised, up-to-date Leased Workers Policy shall be a public document. *See generally* Pls.' Brief at 2-3, 16, 26, 28 (criticizing the Labor Department for lack of transparency, based on agency's reliance on its new Leased Workers Policy – memorialized in a confidential internal agency memorandum – and agency's failure to publicly disclose the criteria it applied in evaluating the Former Employees' TAA petition); Slater Steels Corp. v. United States, 27 CIT ____, ____, 279 F. Supp. 2d 1370, 1379 (2003) ("Agency transparency is a cornerstone of administrative law.").

In addition, as discussed above, the Labor Department must engage in a case-specific analysis of all relevant facts concerning "control."  It is not enough simply to conclude that the facts of this case do not precisely parallel those of Pittsburgh Logistics (or any other case).  It is similarly irrelevant whether PwC or IBM refer to BP as a "client"; and, moreover, a finding of a "service provider-client" relationship in no way necessarily precludes a finding of "control" (or "agency").

Finally, in both its articulation and its application of its policy vis-a-vis TAA certification of leased workers, the Labor Department should recognize and reflect (for purposes of its analysis of "control") the difference between standard, run-of-the-mill leased workers cases (where there was no pre-existing relationship between the leased workers and the company producing the trade-impacted article) *versus* cases – like this one – where the petitioning workers were "outsourced" by their initial employer and then immediately leased directly back to that company, as part of an outsourcing strategy. *See*, *e.g.*, AR 43 (BP Amoco memo re: corporation's "outsourcing strategy" and post-merger decision to "outsource" work then being done by BP Amoco employees at the Accounting Center). *See generally* Pittsburgh Logistics I, 27 CIT at ____, ____, 2003 WL 716272 at ** 10 (summarizing facts surrounding "outsourcing" of PLS workers), 12 (observing that the fact that a particular group of leased workers had been "outsourced" "would strengthen the[ir] argument for eligibility" for TAA benefits).

that standard to the Administrative Record as supplemented on remand – shall ensure that its redetermination is supported by substantial evidence, taking into consideration all other evidence that fairly detracts from its weight. *See*, *e.g.*, Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

### C. The Labor Department's Treatment of the Location of the Former Employees' Workplace

As its third and final ground for denying the Former Employees' TAA petition, the Labor Department concluded that – even if BP exercised "control" over the Former Employees – the Former Employees could not be certified because they were not "co-located with BP workers at a BP facility that produces an article." Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,528; *see also* Def.'s Brief at 16 ("even if BP had 'control' of the [Former Employees], they would not be eligible for TAA benefits *because they were not working in a BP production facility or appropriate subdivision of such a facility*") (emphasis added).[39]

_____

[39]As discussed elsewhere below, to the extent that the Labor Department's Second Negative Redetermination on Remand finds that the Former Employees were not "co-located with BP workers," that factual determination seems to be clearly in error. *Compare* Pls.' Brief at 22-24 & n.9 (noting that "Labor *never* asked whether any BP employees were co-located with the Former Employees" at the Accounting Center, and that – had the agency asked – "it would have determined that twenty-four BP employees continue to work [there]").

The Government makes no attempt to defend the Labor Department's finding on "co-location." *See* Def.'s Brief at 37. Instead, the Government argues that the Labor Department was not required to "request[] information about BP employees who may have worked at the [Accounting Center], as an agency is not obligated to seek information that is not determinative of certification criteria." *Id*. True enough, the agency is not necessarily required to reach determinations on all issues in every case. But – contrary to the Government's implication – where the agency in fact makes a finding on a particular issue (as it did here on "co-location"), that finding must be supported by substantial evidence in the record.

The Labor Department's determination on this so-called "location requirement" defies

meaningful judicial review, for  two overarching reasons.  First, the agency utterly failed to

articulate the legal and policy bases for its position (or, frankly, even to adequately explain exactly

---

It is unclear how "co-location" relates to the other elements of the Labor Department's "location requirement."  For example, the Government attempts to finesse the legal bases for the "co-location" criterion, by conflating it with the other elements of the agency's "location requirement."  *See*, *e.g.*, Def.'s Brief at 35 (asserting that "co-location" criterion is predicated on agency's "long-standing interpretation of the statute, [which requires that] workers must perform their duties either at the affected production facility, or an 'appropriate subdivision' of the facility").  But, contrary to the Government's implication, the Labor Department expressly ruled in this case that – besides being located [1] "at" a [2] "BP" [3] "facility" which [4] "produces an article" – the Former Employees also must have been [5] "co-located with BP workers."  *See* Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,528.  And, contrary to the Government's implication, nothing about the statute or the agency's asserted interpretation of it would appear to mandate any particular staffing of facilities.

The Labor Department's new Leased Workers Policy is silent on "co-location."  *See* Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62).  The derivation of the "co-location" criterion is thus unclear, based on the record here.  Indeed, the Government's brief (as quoted above) implicitly raises the question whether the Labor Department actually deems "co-location" to be a distinct criterion unto itself.  If (contrary to the language of the Notice of Second Negative Redetermination on Remand in the case at bar) the Labor Department in fact views "co-location" simply as one of the indicia of a "*BP*" facility – that is, if one of the indicia for characterization by the agency as a "BP facility" is the presence of BP employees onsite – then "co-location" is effectively subsumed in the definition of "BP facility" and is otherwise essentially superfluous.

In any event, on remand, the Labor Department shall (1) clearly articulate and explain the significance of any "co-location" criterion for TAA certification (and its relationship to other elements of any "location requirement"), as well as the distinctions – if any – that the agency draws between different classes of workers vis-a-vis application of the criterion; (2) adequately justify its position as a matter of law and policy (bearing in mind, *inter alia*, the remedial purpose of the TAA statute); and (3) explain whether, and to what extent, the agency's actual practice in the application of the "co-location" criterion – in this and other cases – has been consistent with the position that it is espousing here.

In addition, to the extent that the Labor Department continues to adhere to the "co-location" criterion, the agency shall – on remand – reconsider its finding on "co-location" in this matter and ensure that its determination is supported by substantial evidence in the record.

what that position is).  And, second, even if the agency had adequately explained and justified its legal position, the factual record that it compiled on the issue is – in a word – anemic.

1.  The Adequacy of the Agency's Rationale

The Government takes the position that the Labor Department's "location requirement" is mandated by the language of the TAA statute.[40]  Specifically, the Government asserts that the agency's "location requirement" flows from "the statutory requirement that . . . workers be '*in* . . . [*a*] *firm*, or an appropriate subdivision of the firm.'"  *See* Def.'s Brief at 35-36 (emphasis and first ellipses added) (*quoting* 19 U.S.C. § 2272(a)(1) (Supp. II 2002)).  The Government thus apparently contends that the statute's reference to a "firm" is a reference to a physical location.  But that claim wilts under scrutiny.

Dictionary definitions establish conclusively that a "firm" is "[a] commercial partnership of two or more persons."  The American Heritage Dictionary 506 (Houghton Mifflin Co. 2d college ed. 1982).[41]  There is therefore no need here to parse the language of the TAA statute, or to have recourse to legislative history, or to resort to the finer points of linguistic analysis.  The plain meaning of the word "firm" is clear.  And, contrary to the Government's claims, a "firm" is not a

---

[40]The Government's argument on this point appears to be entirely *post hoc* rationale. Nothing in the Administrative Record (including the Labor Department's new Leased Workers Policy)  purports to root the agency's "location requirement" in the TAA statute.  *See*, *e.g.*, Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62). *See also* n. 24, *supra*.

[41]*Accord* Webster's Third New International Dictionary of the English Language, Unabridged 856 (Philip Babcock Gove ed. Merriam-Webster Inc. 1986) ("a partnership of two or more persons not recognized as a legal person distinct from the members composing it"); New Riverside University Dictionary 481 (Houghton Mifflin Co. 1988) ("[a] commercial partnership of two or more persons").

physical location at all, much less any *particular* location (such as the premises where "production" of a trade-impacted article occurs, or premises owned or staffed by the company producing a trade-impacted article).[42]

Neither the Labor Department nor the Government has proffered any rationale whatsoever (other than the statutory interpretation discussed above) to justify the Labor Department's position that, to be eligible for TAA certification, the Former Employees must have been "co-located with BP workers at a BP facility that produces an article." Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,528.

The Labor Department itself has provided no historical or other context for its position concerning the location of the Former Employees. And even the Government's brief sheds more heat than light on the subject.[43] It is not entirely clear whether the Government is asserting that the Labor Department historically has consistently and uniformly required that *all* workers (including service as well as production workers, and non-"leased" as well as "leased" workers) must be located "onsite"– for lack of a better word – to be eligible for certification. Or whether the Labor

---

[42]Indeed, the Labor Department's own TAA regulations define "firm" *not* as a location but, rather, as a business entity – including "an individual proprietorship, partnership, joint venture, association, corporation . . . , business trust, cooperative, trustee in bankruptcy, and receiver under decree of any court." 29 C.F.R. § 90.2.

All citations to regulations are to the 2003 edition of the Code of Federal Regulations.

[43]*Compare* Def.'s Brief at 35 (asserting that the Labor Department's location requirement "applies to *all* workers") *with* Def.'s Brief at 36 (asserting that, "just as leased *production* workers must perform their duties on-site to be eligible for certification," so too "investigators must apply the on-site requirement equally to leased service workers"). *See also* Def.'s Brief at 36 (noting that Pittsburgh Logistics held that an "'appropriate subdivision,' pursuant to 29 C.F.R. § 90.2, need not be located at the same site as the firm that produced the article").

Department is asserting only that *leased* workers (including both "leased" production workers *and*

"leased" service workers) must be located "onsite" to be eligible for certification (and that the

locations of non-"leased" workers – whether service workers or production workers – are irrelevant

to the eligibility of those non-"leased" workers).[44]  Or whether the Labor Department is instead

---

[44]Reading between the lines, the phrasing of the Labor Department's new Leased Workers Policy seems to indicate that the agency's "onsite" employment requirement may apply only to "leased workers," and that it is a criterion in addition to establishing the existence of "control." *See* Labor Department Internal Memo re: New Leased Workers Policy (CSAR 261-62).  Such a position could be problematic, for a number of reasons.

First, as a matter of law and logic, location is a factor that is considered in establishing the existence of "control," *i.e.*, it is an indicia of "control."  It is not a distinct criterion, separate and apart from "control," as the Labor Department's new Leased Workers Policy might suggest.  Indeed, the Labor Department's Second Negative Redetermination on Remand in this very case illustrates the point (citing the *location* of the workers as one of the factors used to determine "control").  *See*, *e.g.*, Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,527 (relying on the finding that the Former Employees "were not employed at any BP facility" as a basis for concluding that "IBM workers were not under the control of BP during the relevant time period").

Further, among other things, any policy that requires only leased workers to be located onsite would, in effect, create an irrebuttable presumption that leased workers who are located offsite *are not* under the control of the company that produces the trade-impacted article.  Such a presumption would seem to arbitrarily discriminate in favor of those leased workers who are employed onsite, and against those leased workers who are not.

The mere fact that a group of leased workers is physically located on the premises of a certified (or certifiable) facility is logically not – in and of itself – sufficient to establish that those leased workers *are* under the operational control of the company producing the trade-impacted article (and are thus eligible for certification).  So too the mere fact that another group of leased workers is *not* located on those premises is logically *not* – in and of itself – sufficient to establish that those leased workers are *not* under the operational control of the company producing the trade-impacted article (and thus are not eligible for certification).

In short, there is no apparent rational basis for drawing such a distinction (other than pure administrative convenience on the part of the agency) – particularly given the remedial purpose of the TAA statute, and the commercial realities of today's globalized, electronic marketplace.  In both cases (*i.e.*, both where leased workers are located onsite and where they are located offsite), location would seem to be but one factor – albeit in many cases perhaps a major one – to be examined in

asserting only that *service* workers (whether "leased" or non-"leased") must be located "onsite" to be eligible for certification (and that the locations of production workers – whether "leased" or non-"leased" – are irrelevant to the eligibility of those production workers). Or whether the Labor Department is asserting only that *leased service* workers must be "onsite" to be eligible for certification (and that the locations of all other workers – including non-"leased" service workers, as well as both "leased" and non-"leased" production workers – are irrelevant to the eligibility of all those other workers).

The Government emphasizes that the location of the workers was not at issue in Pittsburgh Logistics. *See* Def.'s Brief at 36. But Pittsburgh Logistics firmly rejected the notion that the Labor Department could treat the single clearest indicia of "control" – corporate ownership or affiliation – as dispositive. If the Labor Department cannot treat even corporate ownership or affiliation as dispositive, it is perhaps unlikely that the agency can proffer an adequate justification for treating *location* as dispositive. Certainly the agency has not yet done so here.

It remains to be seen whether the Labor Department's "location requirement" can be sustained. But if it can be sustained at all, it can be sustained only (1) if the agency clearly articulates its position on the significance (if any) of the physical location of workers vis-a-vis their eligibility for TAA certification, including the distinctions – if any – that it draws between different classes of workers;[45] (2) if the agency adequately justifies that position as a matter of law and policy

_____

evaluating the extent of "control" exercised by the company producing the trade-impacted article.

[45]The Labor Department cannot draw distinctions that violate workers' rights to equal protection. *See generally* Abbott v. Donovan, 6 CIT at 102-03, 570 F. Supp. at 50-51 (emphasizing that a Labor Department determination "that result[s] in dissimilar treatment of similarly situated workers . . . violat[es] . . . their constitutional guarantee of equal protection of the law," if the

(bearing in mind, *inter alia*, the remedial purpose of the TAA statute); and (3) if the agency's actual

practice – in this and other cases – has been consistent with the position that it is espousing here.[46]

(Any inconsistencies in the agency's past practice (*e.g.*, as a result of changes in policy) must, of

course, be explained.)

--------

distinction lacks a rational basis).

[46]Review of the administrative records in TAA cases filed with the court has identified no instances where the Labor Department has posed questions to petitioning workers or their former employers designed to pinpoint the precise physical locations of the petitioning workers. Nor has research disclosed any case where the agency has sought to determine, for example, whether any of the workers in a group under investigation "telecommuted" from home. Similarly, it seems self-evident that, almost by definition, truck drivers who were employed by a company that produced a trade-impacted article and who otherwise met the criteria for TAA certification as service workers (and were therefore certified by the Labor Department) would have spent almost no time "onsite" at the premises of their employer.

On a related point, although it is not entirely clear from the record, it also appears that the Labor Department has in the past certified workers at facilities even though "production" was not occurring on those premises (but was, for example, instead occurring at other premises of the same company). *See* Pittsburgh Logistics II, 27 CIT at ____, 2003 WL 22020510 at * 3 (*quoting* Labor Department determination, where agency explained that "LTV's employees at the Independence, Ohio facility did not produce any articles. . . . They were certified as a third type of appropriate subdivision because they provided services to LTV's Cleveland, Ohio production facility."). *See also* Def.'s Brief at 36 (noting that Pittsburgh Logistics held that an "'appropriate subdivision,' pursuant to 29 C.F.R. § 90.2, need not be located at the same site as the firm that produced the article").

Absent a rational basis for doing so, it would seem to be more than a little arbitrary if, in determining their eligibility for TAA, the Labor Department were to discriminate among the workers controlled by a company producing a trade-impacted article based solely on whether or not they work "under the roof" (so to speak) of the company.

On remand, the Labor Department must clarify, explain and justify both its position and its actual past practice on this point as well. *Compare* Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,528 (reaffirming denial of Former Employees' TAA petition on grounds that they were not located "at a BP facility *that produces an article*").

The Labor Department will have an opportunity to make the case for its "location requirement" on remand. To the extent that the Labor Department continues to maintain that the Former Employees can be certified only if they are employed "at a BP facility that produces an article" (*see* Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,528), the agency shall, *inter alia*, explain clearly and precisely (1) how it defines "facility,"[47] (2) what determines whether or not a particular "facility" is a "*BP* facility" (emphasis added) – or, for that matter, a "facility" of any other company,[48] (3) what determines whether or not a particular "facility"

---

[47]What constitutes a "facility"? For example, is a "facility" necessarily a single structure? Does a corporate "campus" comprising a number of structures constitute a single "facility," or is it multiple "facilities"? What about "off-campus" structures? Can a "facility" comprise several structures that are owned by a single company but are not located on a single plot of land, and are instead located on several plots in relatively close proximity to one another? What about "satellite" offices/structures? Is a "facility" necessarily enclosed? Etc.

[48]What determines whether or not a particular "facility" is a "facility" of the company producing the trade-impacted article? Must the company producing the trade-impacted article own or lease the building? What if the company producing the trade-impacted article owns or leases the building, but operations at that location are staffed entirely by leased employees? What if the company producing the trade-impacted article contracts with a second company to supply both leased workers *and facilities* (so that the facilities remain in the name of the second company, but are the subject of a contract that puts them under the control of the company producing the trade-impacted article)? What if the facility is owned or leased by the second company, but the company producing the trade-impacted article permanently stations some of its own personnel at the structure and installs some of its own equipment there? Etc.

"produces an article,"[49] and (4) what it means to be employed "at" a particular facility.[50]  With respect to each individual aspect of the quoted criterion, the Labor Department's explanation must separately and distinctly articulate in detail the legal and policy justifications for the agency's position (bearing in mind the remedial purpose of the TAA statute), and must include a full and candid discussion of the agency's actual past practice in the application of that specific individual aspect of the criterion to other TAA cases in the past (including the 1999 certification of the Former Employees' colleagues at the Accounting Center).

Finally, it bears emphasis that, even if it is not a determinative issue – a requirement – in determining workers' eligibility for TAA, location may nevertheless remain a very potent consideration.[51]  There can thus be no legitimate concern on the part of the Labor Department that

---

[49]What exactly does the Labor Department mean when it says that a "facility" must "produce an article" if workers there are to be eligible for certification?  Is the agency saying that it will not certify a group of workers at a "facility" unless production is taking place on those very premises?  If not, what relationship is required between the premises where the certified workers work and the premises where actual "production" takes place?  Etc.  *See also* n.46, *supra* (noting that it appears that the Labor Department has in the past certified workers at facilities even though "production" was not occurring on those premises, but was instead occurring at other premises of the same company).

[50]What exactly does it mean to be employed "at" a particular facility?  Are workers employed "at" a facility only if their responsibilities necessitate their physical presence on the premises (and, if so, for what percentage of their work day)?  Is "at" defined in terms of physical presence, or the locus of supervision, or some other consideration?  What about workers who telecommute?  More fundamentally, why must workers be employed "at" any  particular facility in order to be eligible for certification?  Isn't the truly relevant inquiry the nature and relationship of their work vis-a-vis the trade-impacted article (rather than considerations such as proximity or location)?  Etc.

[51]Logically, for example, it should be comparatively more difficult – all other things being equal – to prove the existence of operational control in a case where the group of workers at issue were located at a remote site some distance from the facility of the company producing the trade-impacted article (particularly if there was no supervision at the remote site by employees of the company producing the trade-impacted article).  In contrast, it should be somewhat easier to

the absence of a "location requirement" would "open the floodgates" of petitioners and effectively eviscerate all limitations on the scope of coverage under the statute.

## 2. The Adequacy of the Administrative Record

The Labor Department's failure to clearly articulate and justify its position on the significance of the location of the Former Employees (discussed above) is compounded by its failure to develop the requisite factual record to properly support a determination on the issue.

Incredibly, although location is cited as an independent – and, indeed, the ultimate – basis for denying certification in this case, the Labor Department asked only a single direct question on the subject in the course of its multiple investigations.[52]  Moreover, again – as with the Labor Department's treatment of the issue of "control" (discussed in section IV.B above) – what evidence there is in the Administrative Record as to the issue of location is either conclusory or at odds with the agency's determination.  In at least one instance, it appears that the Labor Department simply got the facts flat out wrong.

As section IV.C.1 explains, the record is silent on the legal and policy bases for the Labor Department's contention that – to be eligible for certification – the Former Employees must have been "co-located with BP workers at a BP facility that produces an article."  *See* Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,528.  On remand, the Labor Department

---

establish the existence of operational control in a case where the petitioning workers were located onsite at some facility of the company producing the trade-impacted article, and ongoing, direct supervision by that company can be more credibly claimed.

[52]*See* CSAR 256 ("Were separated workers of IBM Corporation in Tulsa, OK performing services on-site of BP in 2002 and 2003?").

must not only clearly articulate and explain any criteria for TAA certification related to petitioners'

locations (together with the legal and policy justifications therefor), but – in addition – must fully

develop the evidentiary record on the issue, and must ensure that its findings and conclusions on

remand (applying whatever criteria it determines on remand to be  appropriate) are supported by

substantial evidence in the Administrative Record.

Thus, for example, as discussed in section IV.C.1, it is unclear why the Labor Department

required that the Former Employees have been "co-located with BP workers" to be eligible for TAA

certification.  But, even assuming that the "co-location" criterion is a legitimate requirement, the

existing Administrative Record is simply devoid of evidence to support the agency's finding that

the Former Employees failed to satisfy it.  Indeed, as note 39 explains, the Labor Department's

factual determination on this point appears to be clearly erroneous.  *Compare* Notice of Second

Negative Redetermination on Remand, 69 Fed. Reg. at 48,528 *with* Pls.' Brief at 22-24 & n.9 (noting

that "Labor *never* asked whether any BP employees were co-located with the Former Employees"

at the Accounting Center, and that – had the agency asked – "it would have determined that twenty-

four BP employees continue to work [there]").  It is telling that the Government fails even to

acknowledge – much less attempt to defend – the Labor Department's finding.  *See* Def.'s Brief at

37.[53]

---

[53]On remand, the Labor Department shall consider whether – in light of BP's continued presence there – the Accounting Facility may constitute an "appropriate subdivision" of BP, and whether – on that basis – the Former Employees are eligible for TAA certification. *See* Pls.' Brief at 23 (suggesting that BP employees who were assigned to Accounting Center could be certified for AA "in their own right").

As section IV.C.1 notes, it is similarly unclear why the Labor Department required that the Former Employees have been located at a "BP facility" to be eligible for TAA certification. But, even assuming that it is a legitimate criterion, the agency can point to little or no evidence in the existing Administrative Record to support its determination that the Accounting Center was not such a facility. The only direct, concrete evidence in the existing Administrative Record would appear to support a determination that the Accounting Center *was*, in fact, a "BP facility."

For example, it is undisputed that, even after the "outsourcing," "most" of the work done there was for BP. In addition, as discussed above, the Former Employees worked alongside BP personnel who were permanently assigned to the Accounting Center. BP also maintained infrastructure – including, *inter alia*, a treasury and a mainframe computer – at that location. And the facility itself was even sometimes referred to as "the *BP* [or '*British Petroleum*'] *Accounting Center* operated by IBM." *See* CSAR 256; Betts Decl. ¶ 10 (SAR 140); AR 32; Pls.' Brief at 9, 22-24 & n.9; Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,644 (referring to "the British Petroleum Accounting Center operated by IBM").

Finally, as set forth in section IV.C.1 above, it is also unclear why the Labor Department required the Former Employees to have been located at a facility "that produces an article" to be eligible for TAA certification. But, again – even assuming that it is a legitimate criterion – the agency can point to little real evidence in the existing Administrative Record to support *any* determination as to precisely *where* potentially relevant "production" was (or was not) occurring. The record evidence establishes, at most, that *IBM* was not producing an article at the Accounting Center, and that workers at the Accounting Center do not "support an *IBM* production facility"

located elsewhere. *See* CAR 15; CSAR 199-200 (emphasis added). The Labor Department simply never probed the locations of the "production" activities of *BP*, or the relationship of the Former Employees' work to *BP*'s "production."

More generally, since workers at the Accounting Center were previously certified as eligible for TAA in 1999, it is unclear why that location is now *per se* ineligible. The Labor Department has failed to articulate the respective rationales behind the two determinations vis-a-vis location. Nor has the Labor Department compiled an evidentiary record as to any facts it may deem relevant to support any distinctions that it seeks to draw.

Thus, for example, if the agency historically has attached great weight to the name of the company on the lease or title to the premises in question, one would expect that the agency would have elicited the necessary information in the course of its investigation and included it in the evidentiary record, to support its determination. But no such information appears in the existing Administrative Record – with respect to either the timeframe of the 1999 certification, or the timeframe prior to the Former Employees' discharge.[54] Similarly, to the extent that the agency

---

[54]The Labor Department seems to assume that, at least at the time of the Former Employees' discharge, title to the Accounting Center was in the name of IBM. *See* Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,644 (referring to "the current owner of the [Accounting Center], International Business Machines Corporation"); Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,528 (referring to the Accounting Center as "an IBM-owned facility"). Without expressing a view as to the significance of such a fact (if true), it is worth noting that the Administrative Record includes no direct evidence on the matter.

In correspondence and memoranda, the Labor Department casually refers to the Accounting Center as "an IBM office" (AR 50) and as "the IBM . . . facility" (CSAR 1). IBM officials, in turn, essentially "adopt" the agency's terminology, and also refer to "IBM's location in Tulsa" (CSAR 256). There is, however, no factual basis in the record for the characterization of the Accounting Center as an "IBM" facility (whatever that term may mean).

requires that "production" have occurred on any particular premises, one would expect that the agency would have affirmatively elicited the necessary information in the course of its investigation and included that information in the evidentiary record, to support its determination. But, again, there is relatively little evidence on point in the Administrative Record here. Indeed, there is no evidence at all with respect to the timeframe of the prior certification, and (as discussed immediately above) there is no direct evidence as to the timeframe prior to the Former Employees' discharge.[55]

The Former Employees emphasize that – from before the time of the 1999 certification right up to the time of their discharge – they continued to do the exact same work for BP, sitting at the same desks, located inside the exact same facility. Betts Decl. ¶¶ 7, 8 (SAR 139-40); Mouser Decl. ¶¶ 7, 8 (SAR 145-46). And there is, for example, nothing in the record to suggest that "production" was occurring on the premises of the Accounting Center at the time of the 1999 certification, but was later discontinued. Nor is there anything in the record to suggest that the BP facility that was producing a trade-impacted article at the time of the 1999 certification had ceased such production before the time of the Former Employees' discharge. Nor is there any indication that, at the time of their discharge, the Former Employees were located any further from "BP production" than their colleagues were at the time of the prior certification.

---

The Labor Department's determinations can be sustained only to the extent that they are based on substantial evidence in the record. And inference and assumptions cannot constitute substantial evidence.

[55]Nothing here should be read to suggest that the cited criteria (or the hypothetical means of proving that those criteria have been met) are appropriate under the law. The discussion is for illustrative purposes only.

In short, from a review of the existing Administrative Record, it is impossible to discern exactly what circumstances changed between the time of the 1999 certification and the time of the Former Employees' discharge (other than the company name on the Former Employees' paychecks). Nor is it clear why any such changed circumstances should be significant for purposes of TAA certification.

On remand, the Labor Department shall compile a full and complete evidentiary record on this issue, documenting all potentially relevant facts and circumstances both at the time of the 1999 certification *and* at the time of the Former Employees' discharge (and any pertinent changes in the interim).[56] The evidence elicited shall, *inter alia*, "paint a picture" and effectively map out all relevant facilities and structures and their relationships to one another (geographic and otherwise), and describe in detail the nature of the activities ("production" or otherwise) at the various facilities and structures.

In addition – particularly in light of the Former Employees' representations concerning BP's maintenance of staffing, technology, equipment, and other facilities at the Accounting Center – the Labor Department shall fully explore and document in detail all facts surrounding the nature and extent of BP's presence at, interest in, and control over the Accounting Center at the time of the

---

[56]In compiling the evidentiary record on remand, the Labor Department shall elicit and include all potentially relevant information concerning the issue of location (rather than confining the evidence gathered to that which the agency deems relevant to whatever criteria it determines on remand to be applicable to this case), to ensure that the factual record will be sufficient to support additional analysis (and another determination) if the criteria articulated and applied by the agency on remand are not sustained by the Court.

Former Employees' discharge (including both the nature and extent of its actual exercise of influence, as well as any rights it may have under the terms of the BP-IBM Service Level Agreement).

### D. Other Criteria for Certification

The Labor Department apparently aborted its analysis of the Former Employees' petition, and did not reach determinations on all applicable criteria for certification. For example, in the investigatory "roadmap" that it laid out when seeking its second voluntary remand, the Government advised that – if the Labor Department on remand found "sufficient affiliation [pursuant to the agency's new Leased Workers Policy]" – the agency would then proceed to "investigate BP/AMOCO's operations to determine if the [Former Employees were] providing support for [BP/AMOCO's] production of a trade-impacted article." *See* Consent Motion for [Second] Voluntary Remand at 6. The existing Administrative Record gives no indication that the agency ever really considered – much less made a determination on – the latter issue.

The Former Employees maintain that the ship has already sailed on the question of whether their work was in direct support of BP production. Specifically, the Former Employees emphasize that – in the course of its 1999 certification of the Accounting Center – the Labor Department determined that the Former Employees' colleagues who had just been laid off were "engaged in activities related to [BP's] exploration and production of crude oil and natural gas." *See* Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,528 (noting that, in prior certification, agency determined that workers were "engaged in activities related to exploration and production of crude oil and natural gas") (*discussed in* Pls.' Brief at 32-34).

The Labor Department and the Government seek to dismiss the 1999 certification as completely irrelevant to the petition at bar. *See* Notice of Second Negative Redetermination on Remand, 69 Fed. Reg. at 48,527-28 (stating that the 1999 certification "has no bearing on the [Former Employees'] eligibility"). *See also* Notice of Denial of Reconsideration, 69 Fed. Reg. at 20,644-45; Def.'s Brief at 29-34. But they have failed to explain how – as a matter of logic – the Former Employees' work for BP could now be found *not* to have been in direct support of BP's "exploration and production of crude oil and natural gas," if indeed the Former Employees' work for BP mirrored that of their former colleagues who were determined in 1999 to have been "engaged in activities related to exploration and production of crude oil and natural gas" and who were therefore covered by the prior certification.

On remand, the Labor Department shall make a determination as to whether the Former Employees were "providing support for [BP's] production" – *i.e.*, were "engaged in activities related to exploration and production." If the agency determines that they were not so engaged, its explanation must identify and address in detail, *inter alia*, the specific bases (both legal and factual) for distinguishing the facts and circumstances of this petition from the facts and circumstances underlying the 1999 certification. And – whatever determination the agency reaches – that determination must be supported by substantial evidence in the record.

There are other criteria, as well, that the Labor Department has not yet addressed. However, there is much room for confusion as to precisely how the agency's classic test for certification as "service workers" is to be interpreted and applied in light of the agency's new Leased Workers Policy (as modified by the agency April 2004 policy addressing "certified" vs. "certifiable").

Although the Labor Department has not spelled out the revised criteria in this case, one recent agency determination explains:

> Only in very limited instances are service workers certified for TAA. Namely the worker separations must be caused by a reduced demand for their services from a parent or controlling firm or subdivision whose workers produce an article and who are currently certifiable for TAA; or *if the group of workers are leased workers who perform their duties onsite at the TAA certifiable location on [an] established contractual basis.*

American Wood Notice of Denial of Reconsideration, 70 Fed. Reg. at 45,436.[57]

Under the classic test for certification as "service workers" (discussed in section I.A, above), "the reduction in the demand for [the workers'] services" must have "originated at a production facility *whose workers independently met the statutory criteria for certification*." Chevron I, 26 CIT at 1285, 245 F. Supp. 2d at 1328 (*citing* Bennett v. U.S. Sec'y of Labor, 20 CIT 788, 792 (1996); Abbott v. Donovan, 6 CIT 92, 100-01, 570 F. Supp. 41, 49 (1983)). Assuming that the criterion applies to the Former Employees here, the existing Administrative Record gives no indication that the Labor Department analyzed BP workers' eligibility for certification.

The Administrative Record nevertheless includes much information on point, virtually all of which was submitted by the Former Employees. For example, there is voluminous record evidence that tends both to establish the existence of increased imports during the relevant period, and to corroborate the Former Employees' claims of BP shifts in production. *See*, *e.g.*, Pls.' Brief at 12, 34-38 (distilling and analyzing record evidence of increased imports and shifts in production);

---

[57]*See also* UITS Support Center Notice of Denial of Reconsideration, 70 Fed. Reg. at 46,192 (stating that service workers eligible for TAA certification include "leased workers who perform their duties on-site at a facility that meet[s] the eligibility requirements"); ACCPAC Notice of Negative Determination on Reconsideration, 70 Fed. Reg. at 68,094 (same).

SAR 126-30.  Indeed, the record is barren of any real evidence to the contrary.

On remand, the Labor Department shall spell out with precision all criteria applicable to the Former Employees' potential certification as leased service workers (focusing, *inter alia*, on the relationship, if any, between the classic test for certification as "service workers" and the criteria for certification of service workers under the agency's new Leased Workers Policy (including any revisions or clarifications of that policy in the course of the remand)).  In addition, the Labor Department shall explain the origins of and legal bases for all such criteria.  Further, the agency shall make determinations as to whether each of the criteria is satisfied in this case.  As always, the agency's determinations must be supported by substantial evidence in the record.

## V.  **Conclusion**

Pointing to the court-ordered certification of the workers in Pittsburgh Logistics, the Former Employees here urge the same result.  They contend that the, throughout this case, the Labor Department has "demonstrated an unwavering commitment to a results-oriented approach,"[58] and that where – as here – the agency already has had multiple bites at the apple, certification is "the only alternative."  As the Former Employees acknowledge, however, court-ordered certification is an extraordinary remedy.  *See* Pls.' Brief at 4; Chevron II, 27 CIT at _____, 279 F. Supp. 2d at 1356.

---

[58]*See*, *e.g.*, Pls.' Brief at 4.  It is not the first time that such criticisms have been leveled at the agency.  *See*, *e.g.*, Pittsburgh Logistics I, 27 CIT at _____ n. 13, 2003 WL 716272 at * 7 n.13 (where the court refers to the agency's "foregoing (or foregone) conclusion"); Pittsburgh Logistics II, 27 CIT at _____, _____, 2003 WL 22020510 at ** 7, 9 (where the court found that the agency's consideration of TAA petition was "results-oriented" and that agency's reasoning made its negative determination "appear predetermined"); Former Employees of Murray Engineering, Inc. v. Chao, 28 CIT _____, _____ n.7, 358 F. Supp. 2d 1269, 1273 n.7 (where court found it "simply disingenuous for the agency, upon learning that the HTSUS does not provide the result the agency appears to have already chosen, to now argue that it is inappropriate to refer to the HTSUS").

Under the circumstances, it cannot be said with certainty that one last, very brief, remand would be futile.

Plaintiffs' Motion for Judgment on the Agency Record is therefore granted in part, and this action is remanded to Defendant for further proceedings in conformity with this opinion. However, the Labor Department would be well-advised to engage in full and candid consultations with the Former Employees on all issues, and is officially on notice that no extensions of time will be granted for the filing of its redetermination on remand.

A separate order will enter accordingly.


                                        _____/s/_____
                                            Delissa A. Ridgway
                                                   Judge


Dated:  December 2, 2005
            New York, New York

<u>ERRATA</u>

<u>Former Employees of International Business Machines Corporation v. U.S. Secretary of Labor</u>, Court No. 04-00079, Slip Op. 05-153, dated December 2, 2005.

Page 8:      In the second full paragraph, delete the semi-colon after "(Aug. 7, 2003)".

In the second full paragraph, insert a semi-colon after "(Wackenhut Notice of Denial on Reconsideration)" and before "*see also*".

Page 9:      In footnote 8, replace "Wackenhut Notice of Revised Determination," with "Wackenhut Notice of Denial on Reconsideration,".

Page 10:     In line two, replace "which" with ". . .".

Page 15:     In the last line, replace "(147)" with "(SAR 147)".

Page 21:     In the penultimate line, replace "<u>Former Employees of Chevron Products Co. v. United States</u>," with "<u>Former Employees of Chevron Products Co. v. U.S. Sec'y of Labor</u>,".

Page 23:     In the second paragraph, replace "<u>Former Employees of Alcatel Telecomms. v. Herman</u>," with "<u>Former Employees of Alcatel Telecomms. Cable v. Herman</u>,".

In the second paragraph, replace "24 CIT 655, 658-659, (2000)" with "24 CIT 655, 658-59 (2000)".

In the second paragraph, replace "<u>Assn'n</u>" with "<u>Ass'n</u>".

Page 24:     In line two of the first full paragraph, insert "Notice of" after "*See*" and before "Second Negative Redetermination on Remand,".

In line five of the first full paragraph, replace "I.A" with "in section I.C".

Page 26:     In line five of the third paragraph, replace "Former employees relied" with "Former Employees relied".

In the last line, replace "section V.D" with "section IV.D".

Page 27:     In line two of footnote 18, replace "that the BP" with "that BP".

Page 36:       In line eight, insert opening quotation marks before the word "take".

Page 40:       In footnote 33, delete the period that appears after "1002" and before the parenthetical that follows.

Page 54:       In the last line of footnote 53, replace "AA" with "TAA".

Page 62:       In line two of the second full paragraph, replace "that the, throughout" with "that, throughout".

               In footnote 58, insert "(2004)" after "1273 n.7" and before the parenthetical that follows.

January 6, 2006